**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **TONYA CLAY,**<br>**ANTHONY BONNER,**<br>**JAMES MARTIN,**<br>**GEORGETTE PATTERSON,**<br>**ZACHARY SCRUGGS,**<br>**KINDELL SMITH, AND**<br>**JOVAN VARNER,**<br>c/o Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113, | CASE NO.:<br><br>JUDGE:<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

        Plaintiffs,

-vs-

**CUYAHOGA COUNTY, OHIO**
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**ARMOND BUDISH,**
Cuyahoga County Executive
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**CLIFFORD PINKNEY,**
Cuyahoga County Sheriff
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**ERIC J. IVEY**
Cuyahoga County Corrections Center Warden
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**GEORGE TAYLOR**
Interim Director of Regional Corrections
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**BRANDY CARNEY**
Chief Public Safety & Justice Services Officer
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**THOMAS TALLMAN**
Medical Director
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

and

**METROHEALTH SYSTEM**
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

and

**UNKNOWN DEFENDANTS**
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**UNKNOWN MEDICAL DEFENDANTS**
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

          Defendants.

Plaintiffs Tonya Clay, Anthony Bonner, James Martin, Georgette Patterson, Zachary Scruggs, Kindell Smith, and Jovan Varner for their complaint against Defendants Cuyahoga County, Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, Thomas Tallman, MetroHealth System, Unnamed Defendants, and Unnamed Medical Defendants allege as follows:

## INTRODUCTION

1.      Cuyahoga County Corrections Center (CCCC) is operating under a state of constant crisis, endangering the health and safety of Detainees/Inmates and staff alike on a daily basis. CCCC is underfunded, understaffed, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the jail walls. Detainees/Inmates are regularly denied access to adequate medical and mental health care, hygienic conditions, movement, sufficient and edible food, access to religion, and access to their attorneys. The conditions within CCCC violate the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at CCCC, yet have failed to timely or effectively remedy the deplorable state of affairs.

2.      This is a class-action civil-rights action, brought under 42 U.S.C. § 1983 and Ohio law, challenging the inhumane, dangerous, and unconstitutional conditions endured by Detainees/Inmates at the Cuyahoga County Corrections Center. Plaintiffs, on behalf of themselves and similarly situated individuals, seek injunctive and declaratory relief in order to bring conditions of confinement within CCCC into compliance with federal and state law.

## JURISDICTION AND VENUE

3.      The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C §1983 et seq; the Judicial Code, §§1331 and 1343(a); and the Constitution of the United States.

4.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district.

PARTIES

5.     Plaintiff Tonya Clay is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Clay resided in the City of Cleveland, in Cuyahoga County, Ohio.

6.     Plaintiff Anthony Bonner is presently an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Bonner resided in the City of Cleveland, in Cuyahoga County, Ohio.

7.     Plaintiff James Martin is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Martin resided in the City of Cleveland, in Cuyahoga County, Ohio.

8.     Plaintiff Georgette Patterson is presently an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Patterson resided in the City of Cleveland, in Cuyahoga County, Ohio.

9.     Plaintiff Zachary Scruggs is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Scruggs resided in the City of Cleveland, in Cuyahoga County, Ohio.

10.     Plaintiff Kindell Smith is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Smith resided in the City of Cleveland, in Cuyahoga County, Ohio.

11.     Plaintiff Jovan Varner is presently an inmate a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Varner resided in the City of Cleveland, in Cuyahoga County, Ohio.

12.     Defendant Cuyahoga County ("the County") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County is the employer and principal of Defendants Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, and Thomas Tallman, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center.

13.     Defendant Armond Budish is Cuyahoga County Executive. At all times relevant to the allegations made in this complaint, Budish was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Budish has final policymaking authority over the policies, practices, and customs of the CCCC. He is sued in his official capacity.

14.     Defendant Clifford Pinkney is Cuyahoga County Sheriff. At all times relevant to the allegations made in this complaint, Pinkney was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Pinkney has final policymaking authority over policies, practices, and customs of the CCCC.  He is sued in his official capacity.

15.     Defendant Eric Ivey is the warden of the Cuyahoga County Correctional Center. At all times relevant to the allegations made in this complaint, Ivey was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies,

5

practices, and customs of the Cuyahoga County Corrections Center. Ivey has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

16. Defendant George Taylor is the Interim Director of Regional Corrections for Cuyahoga County. At all times relevant to the allegations made in this complaint, Taylor was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Taylor has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

17. Defendant Brandy Carney is the Chief Public Safety & Justice Services Officer for Cuyahoga County. At all times relevant to the allegations made in this complaint, Carney was acting in her official capacity, within the scope of her employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Carney has final policymaking authority over policies, practices, and customs of the CCCC. She is sued in her official capacity.

18. Defendant Thomas Tallman in the Medical Director of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in this complaint, Tallman was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs related to medical and mental health care at the Cuyahoga County Corrections Center. Tallman has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

19. Defendant MetroHealth System was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County contracts with Defendant MetroHealth System to oversee and provide medical and mental health services at the Cuyahoga

County Corrections Center. Defendant MetroHealth System is a "person" under 42 U.S.C. § 1983 and is responsible for the policies, practices, and customs related to medical and mental health care in the Cuyahoga County Corrections Center.

## FACTS

### History and Development of Unconstitutional Conditions at the Cuyahoga County Corrections Center

20.     Defendants are responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates in custody therein. Defendants are required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

21.     Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of – and have even taken action to worsen – overcrowding, unhygienic conditions, movement restrictions, insufficient and inedible food, lack religious freedom, lack of access to their attorneys, and inadequate medical and mental health care. Defendants have further long been on notice of the incompetent supervision and management of the CCCC.

22.     The track record of Defendant Cuyahoga County and Defendant Pinkney's Sheriff's Department in operating a humane jail facility demonstrates continued indifference and longstanding, systematically unconstitutional operational procedures.

23.     The same problems that existed at the jail facility built in 1930, previously located at East 21st Street and Payne Avenue in Cleveland, Ohio, continue to the present day: overcrowding, poor and unacceptable medical and mental health treatment, poor sanitation, lack of inmate social services, lack of recreation, poor nutrition, and substandard access to religious rights and programs. Since 1975, Defendant Cuyahoga County has been under federal court

monitoring at least twice, leading to the construction of newer facilities that are still in use today: Jail I, built in 1976, and Jail II, built in 1996. These same facilities – Jail I and Jail II – are where Plaintiffs remain in custody today.

24.     In the case of *Sykes, et al. v. Krieger, et al.*, U.S.D.C. N.D. Ohio, Case No. C71-1181, filed November 30, 1971, the parties reached a consent decree in 1975 in order to address constitutional violations in the old County jail. The Court ordered that the jail was engaging in "Fifth and Fourteenth constitutional amendment infringements resulting from prevailing conditions at the Cuyahoga County Jail arising from the inordinately excessive number of inmates incarcerated at the facility," ordering that the overcrowding "cannot be permitted to continue into the future." *Sykes v. Krieger*, 451 F. Supp. 421, 424-425 (N.D. Ohio 1975). The Court further ordered that the jail population "shall not exceed 375 individuals" and ordered the defendants to present a "joint comprehensive plan designed to reduce the population" within a set timeframe. *Id.*

25.     Shortly thereafter, the facility now called "Jail I" (located at West 3rd Street and Lakeside Avenue in Cleveland, Ohio) was opened. But just nine years after *Sykes*, this new facility was the subject of another conditions-of-confinement lawsuit. Filed in 1984, *Watts v. McFaul, et al.,* U.S.D.C. N.D. Ohio, Case No. C84-362, pursued claims related to overcrowding, violations of inmates' right to free worship, and failure to maintain adequate staffing, resulting in the denial of inmate services. This case also resulted in a consent decree, involving federal judicial oversight lasting from 1987 through 1994, which limited the population in Jail I to its maximum capacity of 770 inmates and addressed a panoply of constitutional violations similar to those at issue in this case. *See Watts v. McFaul*, 158 F.R.D. 598 (N.D. Ohio 1994).

26.     However, during the pendency of this consent decree, Cuyahoga County failed to comply with its requirements. In 1989, a motion to show cause was filed against the Sheriff and County commissioners seeking an order of contempt. In October 1991, the Court ordered that all

8

misdemeanants sentenced to Jail I should be released ten days from the date of the order and felons sentenced to serve a prison term there should have their cases reviewed by the trial judge for an alternative resolution. The sheriff was also ordered not to accept any prisoner sentenced there until further court order. Ultimately, in order to avoid either a shutdown of the jail, or other sanctions against public officials, Cuyahoga County was able to submit a bond issue to the voters to fund Jail II, which was built in 1994, prior to the termination of the consent decree. *Id.*

27.     Despite building two new jails in 1976 and 1995, CCCC today operates in complete crisis, under worse overcrowding conditions than these prior federal cases: though the capacity of Jail I and Jail II is only 1,765, as of November 1, 2018, the current Inmate/Detainee population is over 2,400. At least seven people died in CCCC in a four-month span. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

28.     In 2014, County Executive Defendant Armond Budish hired Kenneth Mills as Director of Regional Corrections. Mills was responsible for overseeing operations of the entire CCCC complex. Despite being the highest-ranking administrator of the jail, Mills had absolutely no experience in the field of corrections administration. The in-custody deaths in 2018 all occurred under Mills' watch.

29.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

**The Ohio Department of Rehabilitation and Correction Finds in 2017 that
CCCC Is Operating in Violation of Ohio Law**

30.     The Ohio Department of Rehabilitation and Corrections' (ODRC) Bureau of Adult

Detention November 2017 inspection found CCCC was not in compliance with Ohio's Minimum

Standards for Adult Detention Centers. (ODRC Bureau of Adult Detention Report attached as

Exhibit 1.) The inspection revealed that CCCC was in violation of Ohio Admin Code Sections:

    a.   5120:1-8-04 (A)(4): CCCC was not in compliance with minimum

           requirements for sufficient space, including day space of "thirty-five square

           feet per number of occupants occupying the day space at one time" at a

           "[m]inimum size of one hundred five square feet," as CCCC "exceeded the

           Bureau Recommended Capacity for their facility and there is not the required

           amount of day space for each inmate";

    b.   5120:1-8-04 (B): CCCC was not in compliance with the requirement that

           seating shall be provided in holding areas, holding cells, housing cells,

           dormitories, dayrooms and eating areas for each inmate, having "exceeded the

           Bureau Recommended Capacity for their facility" without "the required

           amount of seating for each inmate";

    c.   5120:1-8-04 (F): CCCC was not in compliance with minimum toilet facilities

           of one operable toilet for every twelve occupants, as CCCC "has exceeded the

           Bureau Recommended Capacity for their facility and there is not the required

           amount of toilets for this standard";

    d.   5120:1-8-04 (G): CCCC was not in compliance with minimum shower

           facilities "of one operable shower for every twelve occupants, as CCCC

exceeded the Bureau Recommended Capacity for their facility and there is not
the required amount of showers for this standard";

e.   5120:1-8-04 (J): CCCC did not provide "[n]atural light" "in housing units,
dorms, cells and/or dayspaces" as "[t]he age and layout of the existing jail
facility does not provide natural light for Housing Unit 4 North";

f.   5120:1-8-11 (A): CCCC did not provide "[e]xercise and/or equipment for
inmates" or "ensure that inmates are offered at least five hours per week" as
CCCC's "current policy, procedures and practices need reinforced to reflect
standard and components specified" and CCCC's "supporting documentation
did not evidence compliance for this standard regarding recreation access for
the Inmate Population in Jail 1."

**The Pretrial Justice Institute Finds in 2017 that CCCC Is Overcrowded**

31.   On September 2017, Pretrial Justice Institute (PJI) issued a report entitled
"Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and
Judicial Feedback." This report found that on average, CCCC has been operating at over 100%
capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice
in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September
2017, available at https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile.
ashx?DocumentFileKey=c4587ef2-8416-18fe-e19d-b188d3691e93&forceDialog=0.)

32.   The PJI report noted that CCCC is so overcrowded that most of Detainees/Inmates
are housed two people per cell even though cells are designed for only one person.

11

**The Cuyahoga County Bail Task Force Finds in March 2018 that**
**Inmates/Detainees Remain in CCCC Custody for Unnecessarily Long Periods of Time**

33.     The PJI report was also cited in the March 16, 2018 Report and Recommendations of the Cuyahoga County Bail Task Force. The Task Force set forth several specific recommendations to centralize pretrial services and reform the bail system in Cuyahoga County, including, for example, providing bail hearings six or seven days a week and accepting bail payments twenty-four hours per day, seven days per week, to ensure that individuals do not sit inside CCCC for unnecessarily long periods of time before bond is set and paid.

**Cuyahoga County Has Been on Notice of Overcrowding and Medical and**
**Mental Health Issues Since at Least 2017 But Has Taken No Action**
**and Instead Increased Overcrowding**

34.     In May of 2018, former Director of Regional Corrections Kenneth Mills admitted to the Cuyahoga County Council that the main jail had been understaffed for "a while," but was unsure exactly how long.

35.     On December 13, 2018 at a CMBA Hot Talks event, Defendant Cuyahoga County Chief Public Safety & Justices Services Officer Brandy Carney admitted that the ODRC's yearly inspection put Defendant Cuyahoga County on notice of overcrowding and issues with medical and mental health care at CCCC.

36.     Nonetheless, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with Ohio's Minimum Standards as defined in Ohio Admin. Code § 5120:1.

37.     Further, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with constitutional standards.

38.     Defendant Cuyahoga County has also regionalized CCCC's operations, and in this process, took over operations for the Cleveland City Jail and other municipal jail facilities. In

12

taking over these facilities, Cuyahoga County increased the number of Detainees/Inmates in County custody despite already-rampant overcrowding in the CCCC.

39.     Upon information and belief, Cuyahoga County officials stated in public meetings that they expected the jail regionalization to bring between $1.7 million and $5.5 million in net revenue annually to Defendant Cuyahoga County. Former Director of Regional Corrections Kenneth Mills stated on April 3, 2018 to Cuyahoga County Council, "[A]s long as we keep the beds filled up, I think it's a very safe projection."

**United States Marshals Service Report Condemns the Conditions at CCCC**

40.     On November 21, 2018, the United States Marshals Service (USMS) released a Quality Assurance Facility Review report. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers. (USMS Report attached as Exhibit 2).

41.     The USMS Report findings include, but are not limited to:

a.   Failure to institute a quality control plan to provide an annual review of CCCC operations to ensure compliance with CCCC policies and procedures;

b.   Failure of Warden and Assistant Warden to make required weekly visits to housing units and visits are not documented;

c.   Failure to maintain proper inmate/detainee records;

d.   Failure to track the frequency and cumulative length of Restrictive Housing Unit (RHU) placement;

e.   Failure to provide updated inmate handbooks, any inmate handbooks in any language other than English, and to properly consider language needs of non-English speakers;

f. Failure to properly track, store, and ensure safety and security of Detainees'/Inmates' personal property;

g. Failure to provide Detainees/Inmates with disabilities with necessary accommodations, including access to all services and programs such as outside recreation;

h. Failure to compensate Detainees/Inmates monetarily for work;

i. Failure to provide necessary staffing;

j. Failure to comply with restrictive housing policies required for Special Response Team (SRT) staff members assigned to RHU;

k. Failure to provide training to RHU staff on correctional implications for brain development of young adults (ages 18-24) and associated de-escalation tactics;

l. Failure to train annually on safety/security/fire/medical procedures, sexual abuse and assault, and supervision of offenders;

m. Failure to properly staff the medical unit;

n. Failure to ensure proper certifications by all medical unit staff;

o. Provision of only minimally-acceptable sanitation in the 7th-floor mental health dispensary;

p. Failure of the medical quality management program or Continuous Quality Improvement (CQI) Program to meet within the past year;

q. Failure to document any corrective actions to remedy problems with medication delivery and duplication of orders by medical providers;

r. Failure to properly maintain and manage medical records;

s. Failure to conduct medical screening of City of Cleveland detainees upon intake;

t.  Failure to make medical unit aware of Detainees'/Inmates' health needs upon intake unless they present urgent or emergency situations;

u.  Failure to conduct comprehensive medical and mental health appraisals within 14 calendar days of Detainee/Inmate arrival;

v.  Failure to conduct oral screenings by dentist or qualified dental staff within 14 calendar days of Detainee/Inmate arrival;

w.  Failure to address the backlog of Detainee/Inmate requests for medical and dental care, known as "kites";

x.  Failure to properly track chronic care patients;

y.  Failure to implement a proactive program to discuss and implement individually-tailored plans for special needs patients which include, but are not limited to, developmentally disabled individuals, frail/elderly individuals, individuals with physical impairments, serious mental health needs, and juveniles;

z.   Failure to provide for juvenile Detainees/Inmates needs with regard to diet, exercise, and nutrition, including the failure of medical staff to request increased caloric diets for juveniles;

aa. Failure to house juveniles separately from adult Detainees/Inmates;

bb. Failure to comply with federal, state, and local regulations regarding the safe disposal and storage of biohazard and infectious waste;

cc. Failure to consistently process medication for Detainees/Inmates who are scheduled for court or changes in housing;

dd. Failure to provide thorough and consistent training for medical administration;

ee. Failure to provide intensive clinical mental health treatment to Detainees/Inmates with stable conditions who are housed in RHU during the entirely of their stays in RHU;

ff. Failure to conduct a face-to-face assessment for Detainees/Inmates with stable mental health conditions in RHU at least once per week;

gg. Failure to conduct weekly security inspections of all areas of the facility;

hh. Failure to conduct daily security inspections upon staff assuming a post;

ii. Failure to maintain records of calls to Main Control and County maintenance personnel regarding areas in need of repair;

jj. Failure to utilize generally-accepted best practices for Use-of-Force teams to ensure staff and Detainee/Inmate safety;

kk. Failure to tag and label as evidence all video tapes involving use-of-force incidents;

ll. Failure to require all persons involved in use-of-force incidents to complete written reports.

42.    The USMS report's analysis of CCCC medical personnel revealed the following shocking deficiencies:

a. One medical staff member had expired CPR certifications;

b. Four medical staff have expired licenses;

c. One Licensed Practical Nurse has no license on file;

d. One Medical Technical Assistant did not have a diploma;

e. Two EduCare nurses had only partial CPR certifications;

f. One Licensed Practical Nurse and one Nurse Practitioner have board actions on their verifications but no documents of the disposition of those actions;

g. CCCC does not utilize a National Practitioner Data Bank to search for health care professional disciplinary or sanctions history.

43. The USMS report also found that the 6th-floor Medical Unit at CCCC is unsanitary and overcrowded.

44. The USMS report also stated that there is no on-site OB/GYN physician on-site at CCCC since June 2018 when the county's prior OB/GYN physician resigned.

45. The USMS report found that CCCC is severely overcrowded: the capacity of Jail I and Jail II is only 1,765, but the current Inmate/Detainee population is over 2,400.

46. The USMS report also found that CCCC is so overcrowded that Detainees/Inmates are regularly forced to sleep on mats on the floor. USMS also documented two pregnant women, including one five-months pregnant woman, sleeping on the floor.

47. The USMS report also found that Detainees/Inmates awaiting court hearings are placed in cells without functioning toilets or running water, and without anywhere to sit, for periods of time greater than ten hours. The USMS review team found that up to 12 inmates were locked in a cell designed for two people while awaiting court hearings. They are left unsupervised.

48. The USMS report also identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/inmates' basic needs."

49. Interviews conducted by the United States Marshals Service revealed concerns among CCCC staff for their own safety and security due to staffing shortages.

50. Rather than taking efforts to appropriately staff the facility, Defendants instead implemented what are referred to as "Red Zone" conditions during which Detainees/Inmates are

confined to their cells for 27+ hours at a time are not permitted to access dayrooms, showers, telephones, or outside recreation areas.

51.     Although CCCC often implements Red Zone restrictions, there is no policy or written directive outlining proper procedures for implementation of Red Zone.

52.     The USMS report noted six deaths at CCCC between June and October 2016. The report further found that CCCC failed to conduct any debriefing or mortality review of these deaths and failed to comply with their own policy requiring documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, and autopsy reports to be available in the medical department. There was also no information regarding these inmate deaths available or maintained in the Warden's office.

53.     Upon information and belief, at least seven inmates died within the custody and care of CCCC between June 10, 2018 to October 2, 2018. Three of these people committed suicide. Over the course of the past year, 55 people have attempted suicide while in the care and custody of CCCC.

54.     After each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

55.     Over 100 Detainee/Inmate interviews conducted by the USMS review team revealed "strong and consistent allegations of brutality, use of force punishment, and cruel treatment of the Security Response Team (SRT)," who dress in para-military uniforms.

56.     The USMS review team also observed SRT officers verbally abusing and aggressively interacting with Detainees/Inmates, and observed aggressive conduct and abusive, explicit language directed at Detainees/Inmates by SRT members.

57.     A strong threat of retaliation faces Plaintiffs and anyone else in the custody of Cuyahoga County who comes forward with information about the conditions at CCCC.

58.     SRT officers escorting Detainees/Inmates to interviews with the USMS review team called those Detainees/Inmates "snitches." The behavior was so threatening and dangerous that the USMS review team requested up to ten Detainees/Inmates be removed from CCCC custody for fear of retaliation and Detainee/Inmate safety.

59.     USMS report findings also address general sanitation in CCCC, noting that sanitation levels throughout the housing pods is poor, and that multiple pods contained no cleaning chemicals for Detainees/Inmates to clean their cells.

60.     USMS report findings also address unsanitary foodservice, including the presence of mice and vermin, molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays.

61.     The USMS report further notes that Detainee/Inmate court meals were not properly refrigerated or stored and were found placed in an unused office area that reeked of dead vermin.

62.     Likewise, the USMS report finds that CCCC engages in intentional and deliberate use of food as a punitive measure, including diets for Detainees/Inmates in RHU lacking basic daily nutritional needs and caloric intake standards.

63.     Further, the USMS report noted that medical and religious diets for Inmates/Detainees whose dietary requirements cannot be met from the main menu are not provided.

64.     Likewise, the USMS report states that there is no Imam available for Muslim Detainees/Inmates.

65.     The USMS further found that Detainees/Inmates assigned to "No Contact Housing" are confined for up to 27 hours at a time, are denied daily access to showers and recreation, and are denied toothbrushes, toothpaste, toilet paper, and razors or barbering.

66. The USMS report also found that Inmates/Detainees are subject to up to 30-day disciplinary isolation without disciplinary hearings in violation of their Fifth and Fourteenth Amendment Due Process rights.

67. The report also stated that in cases involving a potential disciplinary isolation lasting longer than 30 days, those Detainees/Inmates receive a hearing but do not have access to an impartial disciplinary hearing process.

**CCCC Operates in Violation of Ohio Minimum Jail Standards**

68. As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

    a. Failure to provide Detainees/Inmates "with articles to maintain personal hygiene (toothbrush, toothpaste, feminine hygiene items and soap)";

    b. Failure to limit use of force to "the amount of force necessary to control a given situation," where "in no event is physical force used as punishment";

    c. Failure to use holding cells with "[s]ixty square feet for one to three occupants with twenty square feet for each additional occupant up to a maximum of one hundred twenty square feet (six occupants)";

    d. Failure to provide seating in holding areas and cells for each inmate;

    e. Failure to house inmates in double occupancy cells of at least "one hundred square feet with nine feet least dimension for double occupancy, single bunks";

    f. Failure to maintain temperature at "acceptable comfort levels" in cells;

g. Failure to provide "sanitation facilities" including "access to an operable flush toilet and lavatory with hot and cold potable water on a twenty-four hour a day basis without staff assistance";

h. Failure to provide "shower facilities at a minimum of one operable shower for every twelve occupants";

i. Failure to maintain all areas as "safe and sanitary, including food service and laundry areas" and "daily cleaning of toilets, urinals, sinks, drinking facilities and showers in areas occupied by inmates and disposal of garbage";

j. Failure to exchange or launder bed linens once weekly;

k. Failure to exchange or launder issued clothing once weekly, and exchange or launder personal clothing and undergarments twice weekly;

l. Failure to provide each inmate an opportunity for a hot shower at least every forty-eight hours;

m. Failure to provide shaving equipment and supplies daily and to make provisions for inmate haircuts;

n. Failure to provide inmates with access to legal counsel of record including telephone contact, written communication, and confidential visits;

o. Failure to arrange for all levels of health care, mental health care, and dental care, and failure to assure quality, accessible, and timely services for inmates;

p. Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

q. Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a

grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel and treatment or follow-up are provided as necessary;

r.  Failure to maintain accurate health/mental health records in written or electronic format;

s.  Failure to immediately refer inmates evidencing signs of mental illness or developmental disability to qualified mental health personnel;

t.  Failure to provide special nutritional and medical diets;

u.  Failure to serve maintain healthy and sanitary kitchen environment and to immediately address health and cleanliness issues;

v.  Failure to provide exercise, television, table games, reading materials, academic training, and opportunity to practice recognized religions;

w.  Failure to ensure that disciplinary measures do not include corporal punishment or withholding food;

x.  Failure to implement disciplinary hearings and to afford an opportunity to appeal disciplinary actions;

y.  Failure to ensure that administrative segregation is not used as a penalty;

z.  Failure to ensure no retaliation by staff for inmate grievances.

**Former CCCC Official Removed Over Public Statements
about Denial of Detainees'/Inmates' Access to Adequate Medical Care**

69.  Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018 Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the

hiring of nurses and creating an unsafe and environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury", *Cleveland.com* (Dec. 10, 2018), available at https://www.cleveland.com/metro/2018/12/ex-cuyahoga-county-jail-medical-supervisor-subpoenaed-to-testify-before-grand-jury.html.)

70.    Rather than launching an investigation into the medical care crisis at the CCCC, or whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

71.    County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration", *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-of-cuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.)

**CCCC Detainees/Inmates Are Regularly Denied Medical and Mental Health Care**

72.    After Brack's appearance at the May 2018 County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

73.    Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know

23

Case: 1:18-cv-02929  Doc #: 1  Filed:  12/20/18  24 of 61.  PageID #: 24

about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018), available at https://www.cleveland.com
/expo/news/erry-2018/11/12db721f324418/death-of-cuyahoga-county-jail.html.)

74.     Though Defendant County Executive Armond Budish has publicly stated that
CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not
had a staff psychiatrist since April 2018 and only one nurse practitioner administers mental health
care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of
the time.

75.     Lack of adequate staffing of corrections officers further exacerbates the denial of
access to medical and mental health care because there are not sufficient corrections officers to
escort Detainees/Inmates to and from the medical and mental health units.

76.     In June 2018, a state inspector found that CCCC failed to complete required intake
medical assessments within the legally required timeframe.

77.     This delay results in Detainees/Inmates with serious mental health and medical
needs being denied proper care and necessary medication and/or treatment when they enter CCCC
facilities.

78.     Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid
Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did
not receive the required initial medical assessment upon booking, leaving medical conditions
unchecked for days.

79.     In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate
safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day
when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See*
Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director,

former nursing supervisor says," *Cleveland.com* (May 31, 2018), available at https://www.cleveland.com/metro/index.ssf/2018/05/inmates_deprived_of_proper_med.html.)

80.     Compounding medical and mental health issues, CCCC regularly denies Inmates/Detainees access to necessary hygiene products, including sanitary pads and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

### CCCC Inmates/Detainees Are Regularly Denied Access to Attorneys

81.     Members of the criminal defense bar regularly report that they arrive at CCCC to visit clients in Cuyahoga County custody, and after waiting for periods up to hours long, their clients are never brought to speak with them.

82.     Further, Inmate/Detainee visits with counsel are regularly limited to a 30-minute maximum time period.

83.     The failure to transport Inmates/Detainees to visitation areas to speak with counsel impedes their constitutional right to counsel. Further, non-visitation and Restrictive time periods effectively forces defendants to accept plea deals and prevents them from exercising their right to trial, particularly in cases involving complex evidence which cannot be reviewed during 30-minute and/or non-existent attorney visits.

### Defendants' Alleged Attempts to Remedy the Constitutional and State Law Infirmities in the Operation of CCCC Are Inconsistent, Inadequate, and/or Misrepresentations

84.     Cuyahoga County agents have publicly claimed they are taking steps to remedy some problems identified in the USMS report.   However, these "fixes" are inconsistent, inadequate, poorly administered, or have been misrepresented.

85.     Further, Defendants have not remedied any of the constitutional violations within CCCC.

86.     For example, the USMS report states that CCCC refused to install shower curtains for Detainees/Inmates in Red Zone RHU. Likewise, the report describes molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays. Though County officials have publicly claimed they have provided new food trays and shower curtains, putative class members state that the new food trays are already soiled and smell moldy because they were mixed in with the old trays, and many showers still have malfunctioning or moldy shower curtains. Similarly, although County officials have reportedly hired exterminators to treat CCCC facilities, putative class members report they have not seen exterminators and insects are still prevalent throughout the jail, including in cells and in stagnant water and on walls in shower areas.

87.     Cuyahoga County's Board of Control also approved funding on December 17, 2018 for a corrections consulting organization to recommend reforms and a separate expansion of prisoner living space. However, the increased living space will only accommodate 118 of the nearly 700 Inmates/Detainees who are pushing the CCCC population above its rated limit. Until the County decreases the jail population or adds enough beds to house every Detainee/Inmate without exceeding facility capacity, overcrowding remains a dire issue.  Likewise, the corrections consulting organization has an entire year to come up with mere recommendations. (*See* Peter Krouse, "Cuyahoga County Board of Control approves funding for jail study, prisoner space," *Cleveland.com* (Dec. 17, 2018), available at https://www.cleveland.com/news/2018/12/cuyahoga-county-board-of-control-approves-funding-for-jail-study-prisoner-space.html.) But an entire year is far too long to wait to address the desperate and dire crisis in the CCCC. Further, recommendations do not constitute actual reform.

88.     Further, many people remain in CCCC custody due to their inability to post even relatively low bonds. The Cuyahoga County Court of Common Pleas and other local courts

continue to set bonds people are unable to pay, condemning those without financial means to suffer months, and sometimes years, of rights violations in overcrowded CCCC facilities.

89.     Compounding these violations, CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process. Detainees'/Inmates' complaints, kites, and grievances are not delivered and/or go unanswered. Their complaints remain unaddressed, and their suffering continues unabated.

**Class Representative Plaintiffs' Accounts Illustrate and Clarify USMS Report Findings**

90.     As set forth below, Class Representative Plaintiffs have suffered unconstitutional conditions at CCCC.

TONYA CLAY

91.     Plaintiff Tonya Clay is a 48-year-old woman currently held as a pretrial detainee in CCCC. Ms. Clay has been housed in CCCC since September 13, 2018.

92.     When she first arrived at CCCC, Ms. Clay was assigned to sleep on a mat on the floor of the common area in her pod for approximately one month due to overcrowding. Since that time, Ms. Clay has been one of two inmates housed in a cell designed to hold one person. All of the one-person cells on her pod currently house two women – one who sleeps on the metal bunk and one who sleeps on a mat on the floor.

93.     Ms. Clay regularly sees bugs swarming around the showers. Mold covers the walls of the showers and the cracks between the tiles. The drain in the shower Ms. Clay utilized in her previous pod was constantly clogged, resulting in dirty water pooling on the floor and covering Detainee'/Inmates' feet.

94.     As of December 12, 2018, there were no new shower curtains in Ms. Clay's pod and she does not believe any exterminators have been in her pod.

95.     Ms. Clay has been on Red Zone for much of her time at CCCC. Her entire pod was once locked down in cells for two straight days, let out only to pick up/return a food tray, and pick up/drop of laundry.

96.     There was a sink/toilet fixture inside Ms. Clay's previous cell, however it often malfunctioned. For one entire week, the only water available from the sink in Ms. Clay's cell was hot. She therefore had no access to cool drinking water during that week for all durations when she was locked in her cell on Red Zone. Finally, a plumber came in to fix the problem, but a new problem arose. After the plumber's work, black water began flowing from the sink. The black water continued to appear intermittently.

97.     Ms. Clay has resorted only to eating food from the commissary when possible, which is expensive, due to the unsatisfactory food served by CCCC. Ms. Clay has been served milk that was past its expiration date and meat that looked and tasted spoiled. Ms. Clay has also been served chicken patties that were freezer burned and very hard. In general, the food portions are small and are not sufficiently filling.

98.     Ms. Clay is also constantly cold in her cell, making it very difficult to sleep. CCCC refused to give her an extra blanket without a medical order.

99.     Detainees/Inmates are only allotted two sanitary pads at once and must ask for more when required for hygienic purposes. However, corrections officers have told her that the help button in her pod should not be pressed unless someone is "dying." She and other Detainee/Inmates are therefore unable to use the help button to call for more sanitary pads when locked in their cells on Red Zone. Corrections officers have told Ms. Clay that their pod is out of both toilet paper and sanitary pads, and made no apparent effort to locate additional necessary supplies.

100.    Ms. Clay also has only two pair of underwear that she was provided by CCCC, which have become threadbare due to the fact that she washes them herself using her own soap in

28

her cell after each use. Ms. Clay is unable to purchase additional underwear through the commissary because it is not offered: only boxer shorts are sold on commissary for men.

101.    Ms. Clay suffers from neuropathy, glaucoma, and liver damage, among other ailments. These conditions cause her severe pain as well as loss of vision in one eye. CCCC denied her all access to medical care for three months.  When Ms. Clay finally saw a nurse at CCCC, the nurse told her to take Motrin, a medication she is unable to take due to liver issues. After sending several kites requesting care, CCCC allowed Ms. Clay to have blood work done, the results of which she has yet to receive.

102.    Ms. Clay has also been diagnosed with both Bipolar Disorder and PTSD.  She never received a response to any kites sent to the CCCC Social Worker concerning these conditions. CCCC refused to continue the medications Ms. Clay was taking when she arrived at the facility, and instead prescribed different mental health medications. These new medications are not effective and Ms. Clay has sent numerous kites seeking an evaluation. She still has not seen any medical professional to treat her mental health conditions.

103.    Ms. Clay has witnessed intimidation and aggressive tactics on the part of SRT officers. She has been told to "shut the fuck up" and witnessed SRT officers ripping up the sheets of another inmate's bunk during a "shake-down."

104.    Ms. Clay had an altercation with another inmate and, as a result, was moved to segregated housing, known as "the hole," without a disciplinary hearing. While in the hole, Ms. Clay was denied access to all books and reading material other than a Bible. She was also denied phone calls and all non-attorney visits. She was locked into her small cell alone for all but approximately 20 minutes per day when she was permitted to exit the cell to shower. Meals were passed through a slot in the cell door. She remained in the hole for three days.

105.    Ms. Clay is a recovering alcoholic, but has been denied access to AA meetings because they are often canceled due to Red Zone.

106.    Ms. Clay is Christian and is regularly denied the right to practice her religion because church services are canceled and/or severely shortened due to staffing issues.

107.    Ms. Clay has no access to the computer room or law library.

ANTHONY BONNER

108.    Anthony Bonner is a 39-year old man who has been held in CCCC since July 24, 2018.

109.    The food served to Mr. Bonner is consistently very small portions. He has been served bologna with no bread.

110.    Mr. Bonner shares a one-person cell with another man. His toilet was once clogged and inoperable for an entire week. During that time, he and his cell mate had to request permission from corrections officers to use the toilet in the common area during Red Zone lock downs.

111.    Two men locked down in a one-person cell means that one person has nowhere to sit, eat, or sleep but on the floor, the toilet, or his cellmate's bunk (and only if the cellmate permits). Cellmates attempt to give each other privacy when one needs to use the bathroom by hiding under bedsheets or helping to create a makeshift curtain around the toilet with a bedsheet, and by continuously flushing the toilet to prevent sounds and odors from permeating the cell.

112.    Each Detainee/Inmate has only one orange uniform. When this uniform is taken to laundry (which only occurs at sporadic and irregular times), each man must sit in his underwear, if he has any, until the uniform is returned. This means two adult men are forced to sit in a small cell on lockdown for hours in nothing but their underwear, or wrapped in a sheet or towel if they have no underwear. These conditions cause Mr. Bonner to feel emasculated.

113.    Each Detainee/Inmate is issued one thin blanket and two sheets. Detainees/Inmates are not issued a pillow.

114.    The two showers shared by over 48 men in Mr. Bonner's pod are filthy, covered in mold and soap scum. No new shower curtain has been provided for many months. For a period of time, the showers had no curtains.

115.    Most of the time, Mr. Bonner is held on Red Zone lockdown and confined to his cell for 22 hours or more. When Detainees/Inmates are released to take showers and move about the day room, there often is not enough time for all of the men to shower. This causes conflict among Detainees/Inmates who are desperate to clean themselves.

116.    Recreation time is irregularly made available to the Detainee/Inmates, and only to ten people at a time.

117.    Mr. Bonner wants to attend Alcoholics Anonymous meetings, however they are often canceled due to Red Zone and understaffing. Even when meetings do happen, only seven people are permitted to attend.

118.    Religious services are canceled more often than not due to Red Zone restrictions.

119.    Mr. Bonner has been denied access to attorney calls when on Red Zone restrictions.

120.    Mr. Bonner has requested mental health care and has not received any response.

121.    Mr. Bonner was held in isolation for over two weeks. The walls, floor, sink, and toilet were filthy. During this time, he repeatedly requested mental health care and was denied. He was served plain oatmeal for every breakfast and one bologna sandwich, one apple or orange, and one small bag of carrots for every lunch and dinner. He was also served one carton of milk for lunch and dinner, which was often past its expiration date. He was denied access to commissary and therefore unable to supplement this limited food. He was also denied all access to phone calls, visits, movement beyond a short time to use to the shower, recreation, and all books except a Bible.

122.    On another occasion, Mr. Bonner's entire pod was locked down as punishment because corrections officers claimed to have smelled marijuana. All Detainees'/Inmates' privileges were revoked. They were only permitted to leave their cells for 20 minutes at a time on a rotating basis to shower. They were served only plain oatmeal for breakfast, and one bologna sandwich, one apple or orange, and one small bag of carrots for lunch and dinner.

JAMES MARTIN

123.    Plaintiff James Martin is a 35-year-old man in CCCC awaiting sentencing. He has been housed in CCCC since June 20, 2018.

124.    Mr. Martin spent approximately the first two months of his incarceration sleeping on the floor of the common area day room of a pod. The pod was so overcrowded that no cells were available to him or to the 18 men sleeping on the floor in the day room. All of these men had to share one toilet for approximately one month until a second toilet became available.

125.    There are two showers for the entire pod of approximately 48 men. Due to Red Zone restrictions, the men are only permitted out of their cells for limited amount of time daily, and all need to share the showers and phones. As a result, Mr. Martin regularly goes several days without access to a shower because there is not enough time allotted for all men to shower. When he is able to shower, the shower area is riddled with insects and the shower curtain is covered in mold and scum.

126.    Detainees/Inmates are provided with inadequate cleaning chemicals and no towels or rags to apply cleaning chemicals. Just one bucket, one sponge, and one toilet scrub brush are provided daily for all Detainees/Inmates in the entire pod to share.

127.    Further, CCCC does not provide clean laundry on a consistent and regular basis. Each Detainee/Inmate has only one orange uniform. When the orange uniforms are taken to be laundered, each Detainee/Inmate must remain in his underwear until the uniform is returned. If an

32

individual does not have a pair of underwear available to him, he is forced to wrap himself in a towel or sheet to cover himself until the laundry is returned.

128.    Mr. Martin has been denied proper medical care and monitoring for his serious medical needs, despite his attempts to contact medical staff via unanswered kites.

129.    Mr. Martin has a diagnosis of Bipolar I for which he has received medication but not counseling.  He has received no response to his kite for the jail social worker concerning this issue. Mr. Martin often is placed in restrictive housing for conduct resulting from CCCC's failure to properly treat his mental health conditions.

130.    As of December 19, 2018, Mr. Martin has not experienced the changes Defendant Cuyahoga County claims to have implemented – there are no new shower curtains and the food is served on trays that smell dirty and like old food.

131.    Severe Red Zone conditions continue. Mr. Martin was locked down on Red Zone starting from Sunday December 16, 2018 at approximately 9:00 p.m. and continuing until Monday December 17, 2018 at approximately 8:00 p.m. He and his pod-mates were allowed out of their cells to shower, move around, socialize, and use the phone for just two hours, until approximately 10:00 p.m. They were then locked in their cells again until Tuesday. At 2:30 PM on Tuesday December 18, his entire pod remained on Red Zone lockdown.

132.    During Red Zone, Detainee/Inmates are locked in their one-person cells with another person. One person sleeps on a mat on the floor, and one person sleeps on the metal bunk attached to the wall. They eat in their cells. The toilet and sink are attached to the wall and there is no enclosure around the toilet to create any modicum of privacy.

133.    Mr. Martin was recently placed on "cell isolation" for five days during which he was locked in his cell with his cellmate, but was only permitted to leave his cell to shower once a

day for approximately 15 minutes. He never received a hearing or any due process and the jail investigator never interviewed him.

134.    Mr. Martin has sent multiple unanswered kites to CCCC's Head Chaplain regarding religious information and requesting a yarmulke. He is a Hebrew Israelite and has been denied access to a Rabbi and religious services. Mr. Martin believes, but is not sure, that he receives Kosher meals – but the meals are always cold and he is served the same two meals every day.

GEORGETTE PATTERSON

135.    Plaintiff Georgette Patterson is a 53-year-old woman currently serving a five-month sentence in CCCC custody for a misdemeanor conviction.  Ms. Patterson has been housed in CCCC since August 10, 2018.

136.    Upon her admittance to CCCC, Ms. Patterson was not medically screened. She was suffering from food poisoning causing vomiting and diarrhea but was refused medical treatment because CCCC staff accused her of detoxing. She remained in soiled clothes and sheets for almost twelve hours. At the time, she was assigned to a mat on the floor in the common area of a pod.

137.    After a few days at CCCC, Ms. Patterson was sent to the MetroHealth emergency room for chest pains and was diagnosed with hyponatremia. She did not receive any necessary follow-up care at CCCC until three to four weeks later after she sent numerous kites seeking medical attention.

138.    Ms. Patterson also suffers from Celiac Disease and was denied a proper diet by CCCC until approximately one month ago after supporters outside the jail called to advocate on her behalf.  Months of improper diet caused Ms. Patterson to suffer serious medical symptoms and related discomfort.

139.    Ms. Patterson is one of many women housed in CCCC who has suffered and continues to suffer severe pain and discomfort from long-lasting vaginal infections. CCCC and

medical officials continue to deny her access to any necessary and proper medical care to treat the infections over a period of months.

140.    Ms. Patterson has been denied access to Alcoholics Anonymous and Heroin Anonymous. She has witnessed correctional staff turn volunteer AA/HA facilitators away due to insufficient staffing.

141.    Ms. Patterson is also diagnosed with Bipolar Disorder. She was in possession of her prescription medication when she was admitted to CCCC, however the medications were taken from her and were not replaced. Despite sending several kites about mental health care since first arriving at CCCC, she did not receive any therapy or medication to treat her condition until December 18, 2018.

142.    Since arriving at CCCC, Ms. Patterson has shared a one-person cell with another inmate aside from the one week she spent sleeping on the floor of the pod common area. Ms. Patterson was forced to sleep on the floor of the cell, despite the fact that there was a bunk order in Ms. Patterson's medical chart from previous time spent at CCCC. Each of the 14 cells in her pod are filled to double the capacity and people are continuously sleeping on the floor of the pod common room.

143.    CCCC has served Ms. Patterson inconsistent and sometimes inadequate portions of food. At times, she receives only dry cereal for breakfast. She has also been served expired, moldy, spoiled, and otherwise disgusting food, including but not limited to cookies with wheat weevils inside, coleslaw with maggots, bread with mold, and chicken patties with mold. New food trays have been mixed with old and are now smelly and soiled.

144.    There was no running water from the sink in Ms. Patterson's cell for three months, which meant that she had to get drinking water from another source. During Red Zone times or at night, a corrections officer would sometimes allow Ms. Patterson to leave her cell for drinking

water. However, if no officer was around, or if they refused, she had no access to drinking water. Recently, brown water flowed in both the toilet and the sink in Ms. Patterson's cell for three days in a row.

145.    One of the two showers that Ms. Patterson and approximately 28 other inmates use has a clogged drain which causes filthy water to build up to their ankles. Recently, corrections officers removed the shower curtain from the clogged shower rather than fix it. Now, everyone on the pod must share one shower. The shower and the shower curtain are dirty and moldy, and the shower curtain has not been replaced.

146.    Toilet paper is rationed to two rolls per cell per week for cells housing two people. The toilet paper supply is often inadequate to last for the week. The corrections officers in Ms. Patterson's pod consistently tell her that toilet paper has run out.

147.    All women are given only two sanitary pads at a time. Women are required to return to the corrections officers to ask for more, however, they are often told that there are no more sanitary pads available. In this case, women are forced to use toilet paper, if there is any, or their washcloth, if they have one, in lieu of sanitary pads. Although women attempt to save sanitary pads for the following month whenever possible, SRT officers regularly raid and tear apart cells, and during these raids, SRT officers often throw away any extra sanitary pads. Ms. Patterson has also witnessed SRT officers confiscate and throw away women's prescription medical creams during raids.

148.    Ms. Patterson is a Christian and has been denied the free exercise of her religion by CCCC. Church services have been canceled or severely shortened many times due to understaffing and Red Zone lockdowns.

149.    Recently, Ms. Patterson was sent to the Restrictive Housing Unit for three days before she was afforded any due process. After three days, she was ordered to be released at 7:30

36

p.m., however at that time she was told there was nowhere to move her. She remained in Restrictive housing for twelve additional hours. During her first day, she was held for 24 hours inside her cell. On the second and third days she was allowed out for approximately 20 minutes. During the entire three days she was not allowed access to any books but for a Bible, and was permitted no phone calls or visits. She was denied a phone call to her attorney for approximately 24 hours.

ZACHARY SCRUGGS

150.    Plaintiff Zachary Scruggs is a 35-year-old man and has been in County custody as a pretrial detainee in CCCC since March 9, 2018.

151.    Mr. Scruggs' pod is at nearly double the capacity for which it was built – with every cell, designed for one person, holding two men, one who must sleep on a mat on the floor. Mr. Scruggs shares his one-person cell with another man.

152.    Since arriving at CCCC, Mr. Scruggs has had limited access to a shower. At times, he has been forced to wait multiple days between showers: when Detainees/Inmates are briefly released from Red Zone restrictions, there are too many men attempting to use the shower for all men to access showers before Red Zone starts again. There are no new shower curtains; the shower and the curtains are covered in mold and soap scum. There are still bugs in the showers and in the cells. Mr. Scruggs is not aware of any exterminator treating the facility recently.

153.    The toilet in Mr. Scruggs' cell was broken for two weeks, which caused water to flood the cell. During this time, he and his cell-mate had to request permission to use the toilet in the common area during Red Zone. CCCC failed to timely fix the toilet or provide necessary supplies and assistance to clean up the mess. Corrections officers forced them to wait unreasonable amounts of time before permitting them to use the bathroom.

154.    As of December 18, 2018, the only toilet in the common area has been leaking, causing water to flow into the common area of the pod.

37

155.    Mr. Scruggs has witnessed the lack of appropriate staffing in CCCC and is often on Red Zone lockdown as a result. On more than one occasion, his pod was on Red Zone for an entire weekend due to the fact that there was a single officer working to cover four dorms.

156.    Mr. Scruggs' access to the free practice of his religion has also been impacted by Red Zone and staffing shortages. Church services are often cut very short to get inmates back into their cells to begin Red Zone lockdown again.

157.    The food which Mr. Scruggs is served is on trays which smell of mildew, and is often cold due to corrections officers allowing the food to sit for an hour before it is served to Inmates/Detainees. The food portions are small and not filling; he has lost weight while in custody due to insufficient calorie intake.

158.    Mr. Scruggs has also suffered from suicidal thoughts as a direct result of the conditions in CCCC.

159.    CCCC's attorney visitation policies and practices have resulted in a denial of Mr. Mr. Scruggs's right to a lawyer. CCCC only allows thirty minutes at a time to visit with his attorney, which does not allow him enough time to review necessary discovery and evidence in order to assist in his defense.

160.    Mr. Scruggs has experienced intimidation on the part of SRT officers. SRT conducts nearly weekly "shake downs" during which they tear apart cells, flip people off beds, yell and name call for no reason, throw away personal property, and act in an unreasonably aggressive and threatening manner.

KINDELL SMITH

161.    Plaintiff Kindell Smith is a 28-year-old man. He has been held in CCCC as a pretrial detainee since June 21, 2018.

38

162.    Mr. Smith suffers from asthma and requires regular breathing treatments. CCCC does not provide him these breathing treatments as prescribed. Mr. Smith also requires a CPAP machine and although his family provided his CPAP machine to CCCC, officials have never allowed Mr. Smith to use it. Mr. Smith filed a medical grievance regarding his lack of CPAP machine and irregular breathing treatments. He received no response.

163.    Mr. Smith violated a phone restriction policy and, as a result, his phone privileges were ordered Restrictive.  He was then placed in segregated housing, where he was held in solitary confinement for 24 hours per day.  During the time Mr. Smith was in segregated housing, food was regularly held back by corrections officers, he received no recreation time, and he was repeatedly threatened with mace.  Corrections officers also choked Mr. Smith.

JOVAN VARNER

164.    Plaintiff Jovan Varner is a 33-year-old man. He has been held in CCCC as a pretrial detainee since December 20, 2017.

165.    During his time in CCCC, Mr. Varner has witnessed mice near food in the kitchen. The meals served to him by CCCC are very small portions, are often cold, and are served on food trays which have a mildew smell. He has not observed any new trays.

166.    CCCC houses Mr. Varner with another inmate in a cell designed to house only one inmate at a time. He has slept on the floor for the entire year he has been at CCCC.

167.    At one point, Mr. Varner spent three weeks in a cell with a broken toilet that had urine and feces sitting in it. Although he made several complaints, CCCC failed to fix the toilet in a timely manner. Instead, a corrections officer told Mr. Varner to put a bag in his toilet to collect excrement and other solids with and then to dispose of the bag periodically. As a result, Mr. Varner and his cellmate were forced to endure the odor of both urine and excrement throughout the cell.

168.    The conditions at CCCC make it impossible for Mr. Varner to keep himself clean, hygienic, and appropriately groomed. The pod on which Mr. Varner is housed has two showers for approximately 48 inmates. Due to the number of men and the limited time during which the men can access the shower, Mr. Varner is unable to shower daily, and sometimes for periods of several days. These showers are infested with insects, and the showers and shower curtains are not only moldy, but Detainees/Inmates are also given insufficient supplies with which to clean showers and their own cells.

169.    Despite the fact that barbers are supposed to visit CCCC once per month, Mr. Varner has been denied access to regular haircuts; he has been waiting approximately six months for a haircut.

170.    CCCC washes Mr. Varner's clothing only approximately once every one to two weeks.  His sheets are washed even less frequently.

171.    Mr. Varner suffers from asthma and should carry an inhaler. He had an inhaler on his person when entering into custody at CCCC, however CCCC staff took it away from him. Mr. Varner's multiple kites for medical treatment have gone unanswered. Since his admission to CCCC, Mr. Varner has not been able to access any inhaler and has not received necessary medical treatment.

172.    Mr. Varner also suffers from PTSD from previous traumatic life events.  He has written several kites regarding treatment, however has only been seen for counseling once since entering CCCC.

173.    Most days, Mr. Varner's pod is locked down on Red Zone. During Red Zone, Mr. Varner and his cell mate are locked into one-person cell – sometimes for dangerously long periods of time. During Red Zone, corrections officers are not easily accessible to the Detainees/Inmates. The Detainees/Inmates are not permitted access to the phone, showers, television, or recreation.

Church services are shortened. Mr. Varner and the other Detainees/Inmates spent most of Thanksgiving 2018 locked down on Red Zone; as a result, he was unable to call his family.

174. SRT officers frequently search Mr. Varner's cell. He feels highly intimidated by SRT officers and their extremely aggressive tactics toward Detainees/Inmates.

CLASS ACTION ALLEGATIONS

The CCCC Class

175. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, and Varner (collectively the "CCCC Class Plaintiffs") bring this action on behalf of themselves and a class of similarly situated persons who are now, or will in the future be, subjected to the policies, practices, and customs of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement.

176. **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The CCCC Class is so numerous that joinder of all class members is impracticable. As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein and therefore face a significant risk of serious illness, injury, and death. Additionally, the class membership is fluid as Detainees/Inmates enter and exit the facilities daily.

177. CCCC Class members are identifiable using records maintained in the ordinary course of business by CCCC.

178. **FED. R. CIV. P. 23(a)(2) – Commonality**: Common questions of law and fact exist as to all CCCC Class members. Among the common questions are:

    a. Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, subject class members to

41

an ongoing, substantial and imminent risk of physical and psychological harm, illness, and death;

b.   Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, violate the class members' Fourth, Fifth, and Fourteenth Amendment rights to due process;

c.   Whether the conditions of confinement in CCCC violate the Eighth Amendment's prohibition on cruel and unusual punishment;

d.   Whether the Defendants' refusal to provide adequate medical, including dental, and mental health care to class members constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment;

e.   Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, result in constitutionally cognizable harm or present a constitutionally unacceptable risk of harm;

f.   Whether the Defendants unreasonably instituted or condoned the conditions of confinement in CCCC and refused to provide adequate medical and mental health care;

g.   Whether the Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of class members;

h.   Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' constitutional rights through the conditions under which they confine class members and the lack of adequate medical or mental health care; and

i.   Whether the Defendants fail to hire, train and/or supervise CCCC staff and agents resulting in violations of class members' constitutional rights.

179.    **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the CCCC Class, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

180.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire class.

181.    **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the class and will serve diligently as a class representative. Their interests are aligned with those of the CCCC class and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

182.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

183.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the CCCC Class are common to and apply generally to all members of the Class. The injunctive and declaratory relief sought will apply as a whole to all members of the CCCC Class.

184.    A class action would be the most fair and efficient method of adjudicating the class members' claims.

### The Restrictive Housing Subclass

185.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, and Varner (collectively the "Restrictive Housing Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are

now, or will in the future be, held in any form of Restrictive housing in CCCC, including but not limited to Red Zone.

186. **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Restrictive Housing Subclass is so numerous that joinder of all subclass members is impracticable. As of October 30, 2018, over 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein, including but not limited to Red Zone, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

187. Restrictive Housing Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

188. **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Restrictive Housing Subclass members and predominate over any individual issues that may exist. Among the common questions are:

    a. Whether Red Zone restrictive housing violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;

    b. Whether the use of restrictive housing and isolation as punishment without due process violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;

    c. Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Fourth, Fifth, Eighth, and

Fourteenth Amendments through the use of Red Zone, isolation, and other restrictive housing under which they confine subclass members;

d. Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments;

e. Whether the Defendants unreasonably instituted the conditions of confinement, condoned such conditions, and/or were deliberately indifferent to them.

189. **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Restrictive Housing Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

190. Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

191. **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Restrictive Housing Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

192. **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates – all of the Detainee/Inmates in custody at CCCC are held under Red Zone isolation conditions and many are held under even further restrictive conditions – and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

193.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Restrictive Housing Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Restrictive Housing Subclass.

194.    A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Medical Care Subclass

195.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Martin, Patterson, Smith, and Varner (collectively the "Medical Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to medical care.

196.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Medical Care Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to adequate medical care, including dental care, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

197.    Medical Care Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

198.    **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Medical Care Subclass members and predominate over any individual issues that may exist. Among the common questions are:

a.    Whether Defendants' failure to operate a system of adequate medical care poses a substantial risk of serious harm in violation of subclass members' Eighth and Fourteenth Amendment rights;

b.    Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Eighth and Fourteenth Amendments through the failure to operate a system of adequate medical care;

c.    Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Eighth and Fourteenth Amendments;

d.    Whether Defendants have been objectively unreasonable and/or deliberately indifferent to the serious health care needs, including medical care needs of subclass members, and to the risk posed by their failure to maintain an adequate health care system;

e.    Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate medical care.

199.    **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Medical Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

200.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

201.    **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Medical Care Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

202.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

203.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Medical Care Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Medical Care Subclass.

204.    A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Mental Health Care Subclass

205.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, and Varner (collectively the "Mental Health Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to mental health care.

206.   **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Mental Health Subclass is so numerous that joinder of all class members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to adequate mental health care, therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

207.   Mental Health Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

208.   **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Mental Health Subclass members and predominate over any individual issues that may exist. Among the common questions are:

a.   Whether Defendants' failure to operate a system of adequate mental health care poses a substantial risk of serious harm in violation of subclass members' Eighth and Fourteenth Amendment rights;

b.   Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Eighth and Fourteenth Amendments through the failure to operate a system of adequate mental health care;

c.   Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Eighth and Fourteenth Amendments;

d.   Whether Defendants have been objectively unreasonable and/or deliberately indifferent to the serious health care needs, including mental health care needs of subclass members, and to the risk posed by their failure to maintain an adequate health care system;

49

e. Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate mental health care.

209. **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Mental Health Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

210. Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

211. **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Mental Health Care Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

212. **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

213. This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Mental Health Care Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Mental Health Care Subclass.

214. A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

**The Religious Freedom Subclass**

215.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, and Varner (collectively the "Religious Freedom Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional deprivation of their right to religious freedom.

216.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Religious Freedom Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the lack of access to religious practice and expression. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

217.    Religious Freedom Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

218.    **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Religious Freedom Subclass members and predominate over any individual issues that may exist. Among the common questions are:

    a.  Whether the denial of access to religious texts, services, leaders, clothing/grooming, and/or diets violates subclass members' First Amendment rights;

    b.  Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' rights under the First Amendment;

    c.  Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of class members' rights under the First Amendment.

219.     **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Religious Freedom Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

220.     Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

221.     **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Religious Freedom Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

222.     **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

223.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Religious Freedom Subclass are common to and apply generally to all members of the Subclass.  The injunctive and declaratory relief sought will apply as a whole to all members of the Religious Freedom Subclass.

224.     A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth, Eighth and Fourteenth Amendments

225.     All of the foregoing paragraphs are incorporated as though fully set forth here.

52

226.     The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

227.     The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiff's basic human rights and dignity, and their right to be free from unconstitutional conditions of confinement, cruel and unusual punishment, and unreasonable searches and seizures under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

228.     These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

229.     Defendants have been and are aware of the unconstitutional and dangerous conditions of the CCCC and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the classes they represent.

230.     Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the classes they represent tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

231.     Plaintiffs have no adequate remedy at law for these violations.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment

232.    All of the foregoing paragraphs are incorporated as though fully set forth here.

233.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the First Amendment to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

234.    The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiffs' rights to freely and openly exercise their religious freedom guaranteed under the First Amendment to the United States Constitution.

235.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

236.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them  by failing to take steps to prevent the harm and/or provide a remedy.

237.    Defendants have caused and continue to cause Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

238.    Plaintiffs have no adequate remedy at law for these violations.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Sixth Amendment

239.    All of the foregoing paragraphs are incorporated as though fully set forth here.

240.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Sixth Amendment of the United States Constitution, which guarantees the right to effective assistance of counsel and the right to confer with one's lawyer. These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

241.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violation of the constitutional rights of Plaintiffs and the classes they represent.

242.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

243.    Defendants have caused Plaintiffs and the class they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

244.    Plaintiffs have no adequate remedy at law for these violations.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fifth Amendment

245.    All of the foregoing paragraphs are incorporated as though fully set forth here.

246.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fifth Amendment of the United States Constitution, which protects against the denial of liberty without due process of law.

These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

247. Restrictive housing policies and practices, including but not limited to Red Zone, without due process have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

248. The CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process.

249. Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

250. Defendants have caused Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

251. Plaintiffs have no adequate remedy at law for these violations.

### PRAYER FOR RELIEF

Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class and subclasses they represent have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the violations of these rights create a present and significant risk of injury, illness, and death.

WHEREFORE, Plaintiffs and the class and subclasses they represent request that the Court grant them the following relief:

a.  Declare that this lawsuit be certified under Federal Rule of Procedure 23 as a Class Action on behalf of all present and future inmates of the CCCC;

b.  Adjudge and declare that the acts, omissions, and practices of Defendants and their agents, employees, officials, and all persons acting in concert with them, under color of law and otherwise, as described herein, are in violation of the rights of Plaintiffs and the class and subclasses they represent pursuant to the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

c.  Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of law, from subjecting Plaintiffs and the class and subclasses they represent to the illegal and unconstitutional conditions, acts, omissions, policies, practices, and customs set forth above, including the following specific relief:

1.  That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from operating the CCCC in violation of the minimum standards for full service jails in the State of Ohio, including maintaining population at or below the maximum permitted population and from requiring detainee/inmates to sleep on the floor;

2.  That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining Defendants from operating the CCCC in an unsanitary and unsafe manner, including but not limited to enjoining Defendants from housing detainee/inmates without access to safe and clean drinking water, toilets, hygienic conditions, and providing moldy, spoiled, unsafe food;

57

3. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from denying detainee/inmates adequate access to necessary medical and mental health care;

4. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent by ordering Defendants to allow ready access to confidential attorney visits and free exercise of religion;

5. Appointment of a monitor to create, institute, and oversee a plan to immediately take corrective action to address the constitutional violations and the policies, practices, and customs of the Defendants which proximately cause the constitutional violations set forth above;

a. Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practicable, a plan to eliminate the substantial risk of serious harm suffered by Plaintiffs and the class and subclasses they represent as a result of Defendants' policies, practices, customs, and failures to train and supervise correctional and medical staff, as set forth herein. The plan should include, at a minimum:

1. Population: Policies and procedures for population management so that the number of prisoners is kept at a level that can be safely managed and is not in excess of CCCC facilities' legal capacity;

2. Staffing: Policies and procedures to increase the number of trained correctional and medical staff to ensure the safety and security of the Detainee/Inmate population;

3. Environmental Conditions: Policies, procedures, and training to improve basic sanitary conditions that do not promote the spread or exacerbation of

58

diseases or infections, including but not limited to immediately reducing overcrowding, a deep clean of the facilities, bed bug extermination, and remedying plumbing problems and access to clean drinking water;

4. Classification and Housing: Policies, procedures, and training to classify and house prisoners to ensure their safety and security;

5. Screening: Policies, procedures, and training for thorough screening for medical, dental, and mental health conditions that require treatment, and for communication of medical, dental, and mental health needs to medical, dental, and mental health care providers;

6. Health Care Access: Policies, procedures, and training that provide prisoners with timely access to health care;

7. Health Care Staffing: Policies and procedures to provide prisoners with timely access to sufficient numbers of qualified and competent clinicians who can provide routine, urgent, emergency, and specialty health care, and who do not withhold care for punitive purposes;

8. Emergency Response: Policies, procedures, and training for timely and competent responses to medical and mental health emergencies;

9. Medication and Supplies: Policies, procedures, and training for timely, secure, and accurate prescription and distribution of medications and supplies necessary for medically adequate care;

10. Chronic Care: Policies, procedures, and training for timely access to competent care for chronic conditions;

11. Mental Health Treatment: Policies, procedures, and training for: timely access to necessary treatment by qualified staff for serious mental health

needs, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch; access to hospitalization and inpatient care; prohibitions or limitations on the use of seclusion and restraints; disciplinary policies and practices regarding persons with psychiatric disabilities that appropriately consider their disabilities; and training of corrections and health care staff to recognize and treat prisoners' psychiatric and/or psychological disabilities;

12. Quality Assurance: Policies and procedures for a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

13. Restrictive Housing: Policies and procedures prohibiting confinement of Detainees/Inmates in conditions of social isolation and restrictive movement that put prisoners at substantial risk of serious physical and mental harm;

14. Grievances: Policies, procedures, and training for an effective, accessible, and well-administered grievance process;

b. Order the implementation of meaningful due process rights for inmates who are accused of rule infractions, which includes notification, a hearing by impartial staff, the ability to call witnesses, and the ability to question the accuser;

c. Order the implementation of reasonable system for determining sanctions for inmates found to have committed rule infractions, to be identified in the inmate handbook, setting forth the specific punishment for various institutional offenses, and eliminating unfettered discretion in punishment and removal of privileges;

d.   Order Defendants to allow access to religious services and to cease and desist from infringing upon religious freedom;

e.   Order Defendants to provide Detainees/Inmates with open, unrestricted, private, contact visits with their attorneys;

f.   Order the appointment of an independent Ombudsman to hear Detainee/Inmate complaints at CCCC;

g.   Order Defendant to create and honor a Detainee/Inmate Bill of Rights;

h.   An award of costs and reasonable attorneys' fees to Plaintiff's counsel in an amount to be determined by the Court;

i.   All such other relief to which Plaintiff is entitled and/or this Court deems equitable.

### *TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED.*

*/s/ Sarah Gelsomino*
Sarah Gelsomino (0084340)
Jacqueline Greene (0092733)
Terry Gilbert (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, Ohio 44113
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
tgilbert@f-glaw.com

James L. Hardiman (0031043)
CLEVELAND BRANCH NAACP
3615 Superior Avenue
Cleveland, Ohio 44114
T: (216) 431-7811
F: (216) 431-7644
attyjhard@aol.com

J. Philip Calabrese (0072709)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, Ohio 44113
T: (216) 443-9000
F: (216) 443-9011
pcalabrese@porterwright.com

Caroline H. Gentry (0066138)
PORTER WRIGHT MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, OH 45402
T: (937) 449-6748
F: (937) 449-682
cgentry@porterwright..com

*Counsel for Plaintiffs*
Dated: December 20, 2018