# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **TONYA CLAY,**<br>**ANTHONY BONNER,**<br>**JAMES MARTIN,**<br>**GEORGETTE PATTERSON,**<br>**ZACHARY SCRUGGS,**<br>**KINDELL SMITH, AND**<br>**JOVAN VARNER,** | **CASE NO.  1:18 CV 2929**<br><br>**JUDGE SOLOMON OLIVER, JR.** |

Plaintiffs,

and

**TAMAR EVANS,**
**JERRY THOMAS,**
**ROBERT GREEN,**
**AMJAD ABUHAMDE,**
**FRANCES JOHNSON,**
**ALLEN REESE,**
**FRANKLIN PAYNE,**
**SIDNEY GREEN,**
**BRANDON LAYNE,**
**ROY BRIDGET,**
**JAMES GOWNEY,**
**TREVIS JOHNSON, and**
**TIMOTHY BENNETT,**
c/o Friedman & Gilbert
55 Public Square, Suite 1055
Cleveland, Ohio 44113,

New Party Plaintiffs,

-vs-

**CUYAHOGA COUNTY, et al.,**

Defendants.

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Tonya Clay, Anthony Bonner, James Martin, Georgette Patterson, Zachary Scruggs, Kindell Smith, Jovan Varner, Tamar Evans, Jerry Thomas, Robert Green, Amjad Abuhamde, Frances Johnson, Allen Reese, Franklin Payne, Sidney Green, Brandon Layne, Roy Bridget, James Gowney, Trevis Johnson, and Timothy Bennett for their complaint against Defendants Cuyahoga County, Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, Thomas Tallman, MetroHealth System, Unnamed Defendants, and Unnamed Medical Defendants allege as follows:

## INTRODUCTION

1.      Cuyahoga County Corrections Center (CCCC) is operating under a state of constant crisis, endangering the health and safety of Detainees/Inmates and staff alike on a daily basis. CCCC is underfunded, understaffed, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the jail walls. Detainees/Inmates are regularly denied access to adequate medical and mental health care, hygienic conditions, movement, sufficient and edible food, access to religion, and access to their attorneys. The conditions within CCCC violate the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), and the Rehabilitation Act. Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at CCCC, yet have failed to timely or effectively remedy the deplorable state of affairs.

2.      This is a class-action civil-rights action, brought under 42 U.S.C. § 1983, the ADA, the Rehabilitation Act, and Ohio law, challenging the inhumane, dangerous, and unconstitutional conditions endured by Detainees/Inmates at the Cuyahoga County Corrections Center. Plaintiffs, on behalf of themselves and similarly situated individuals, seek injunctive and declaratory relief

in order to bring conditions of confinement within CCCC into compliance with federal and state law.

### JURISDICTION AND VENUE

3.      The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C §1983 et seq; the Constitution of the United States, Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act") and the regulations promulgated thereunder, and the Judicial Code, §§1331 and 1343(a).

4.      The Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district.

### PARTIES

6.      Plaintiff Tonya Clay is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Clay resided in the City of Cleveland, in Cuyahoga County, Ohio.

7.      At the time his claims were filed, Plaintiff Anthony Bonner was an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Bonner resided in the City of Cleveland, in Cuyahoga County, Ohio.

8.      At the time his claims were filed, Plaintiff James Martin was a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Martin resided in the City of Cleveland, in Cuyahoga County, Ohio.

3

9.      At the time her claims were filed, Plaintiff Georgette Patterson was an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Patterson resided in the City of Cleveland, in Cuyahoga County, Ohio.

10.      At the time his claims were filed, Plaintiff Zachary Scruggs was a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Scruggs resided in the City of Cleveland, in Cuyahoga County, Ohio.

11.      At the time his claims were filed, Plaintiff Kindell Smith was a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Smith resided in the City of Cleveland, in Cuyahoga County, Ohio.

12.      Plaintiff Jovan Varner is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Varner resided in the City of Cleveland, in Cuyahoga County, Ohio.

13.      Plaintiff Tamar Evans is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Evans resided in the City of Cleveland, in Cuyahoga County, Ohio.

14.      Plaintiff Jerry Thomas is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Thomas resided in the City of Cleveland, in Cuyahoga County, Ohio.

15.      Plaintiff Robert Green is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Green resided in the City of Cleveland, in Cuyahoga County, Ohio.

16.      Plaintiff Amjad Abuhamde is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Abuhamde resided in the City of Cleveland, in Cuyahoga County, Ohio.

4

17.     Plaintiff Frances Johnson is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Johnson resided in the City of Cleveland, in Cuyahoga County, Ohio.

18.     Plaintiff Allen Reese is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Reese resided in the City of Cleveland, in Cuyahoga County, Ohio.

19.     Plaintiff Franklin Payne is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Payne resided in the City of Cleveland, in Cuyahoga County, Ohio.

20.     Plaintiff Sidney Green is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Green resided in the City of Cleveland, in Cuyahoga County, Ohio.

21.     Plaintiff Brandon Layne is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Layne resided in the City of Cleveland, in Cuyahoga County, Ohio.

22.     Plaintiff Roy Bridget is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Bridget resided in the City of Cleveland, in Cuyahoga County, Ohio.

23.     Plaintiff James Gowney is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Gowney resided in the City of Cleveland, in Cuyahoga County, Ohio.

24.     Plaintiff Trevis Johnson is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Johnson resided in the City of Cleveland, in Cuyahoga County, Ohio.

25.     Plaintiff Timothy Bennett is presently in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Bennett resided in the City of Cleveland, in Cuyahoga County, Ohio.

26.     Defendant Cuyahoga County ("the County") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County is the employer and principal of Defendants Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, and Thomas Tallman, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center.

27.     Defendant Armond Budish is Cuyahoga County Executive. At all times relevant to the allegations made in this complaint, Budish was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Budish has final policymaking authority over the policies, practices, and customs of the CCCC. He is sued in his official capacity.

28.     Defendant Clifford Pinkney is Cuyahoga County Sheriff. At all times relevant to the allegations made in this complaint, Pinkney was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Pinkney has final policymaking authority over policies, practices, and customs of the CCCC.  He is sued in his official capacity.

29.     Defendant Eric Ivey is the former warden of the Cuyahoga County Correctional Center. At all times relevant to the allegations made in this complaint, Ivey was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Ivey has final

6

policymaking authority over policies, practices, and customs of the CCCC.  He is sued in his official capacity.

30.     Defendant George Taylor is the former Interim Director of Regional Corrections for Cuyahoga County. At all times relevant to the allegations made in this complaint, Taylor was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Taylor has final policymaking authority over policies, practices, and customs of the CCCC.  He is sued in his official capacity.

31.     Defendant Brandy Carney is the Chief Public Safety & Justice Services Officer for Cuyahoga County. At all times relevant to the allegations made in this complaint, Carney was acting in her official capacity, within the scope of her employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Carney has final policymaking authority over policies, practices, and customs of the CCCC.  She is sued in her official capacity.

32.     Defendant Thomas Tallman in the Medical Director of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in this complaint, Tallman was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs related to medical and mental health care at the Cuyahoga County Corrections Center. Tallman has final policymaking authority over policies, practices, and customs of the CCCC.  He is sued in his official capacity.

33.     Defendant MetroHealth System was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County contracts with Defendant MetroHealth System to oversee and provide medical and mental health services at the Cuyahoga

County Corrections Center. Defendant MetroHealth System is a "person" under 42 U.S.C. § 1983 and is responsible for the policies, practices, and customs related to medical and mental health care in the Cuyahoga County Corrections Center.

FACTS

**History and Development of Unconstitutional Conditions at
the Cuyahoga County Corrections Center**

34.    Defendants are responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates in custody therein. Defendants are required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

35.    Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of – and have even taken action to worsen – overcrowding, unhygienic conditions, movement restrictions, insufficient and inedible food, lack religious freedom, lack of access to their attorneys, *lack of accommodations for physical and psychological disabilities,* and inadequate medical and mental health care. Defendants have further long been on notice of the incompetent supervision and management of the CCCC.

36.    The track record of Defendant Cuyahoga County and Defendant Pinkney's Sheriff's Department in operating a humane jail facility demonstrates continued indifference and longstanding, systematically unconstitutional operational procedures.

37.    The same problems that existed at the jail facility built in 1930, previously located at East 21st Street and Payne Avenue in Cleveland, Ohio, continue to the present day: overcrowding, poor and unacceptable medical and mental health treatment, poor sanitation, lack of inmate social services, lack of recreation, poor nutrition, and substandard access to religious rights and programs. Since 1975, Defendant Cuyahoga County has been under federal court

monitoring at least twice, leading to the construction of newer facilities that are still in use today: Jail I, built in 1976, and Jail II, built in 1996. These same facilities – Jail I and Jail II – are where Plaintiffs remain in custody today.

38.     In the case of *Sykes, et al. v. Krieger, et al.*, U.S.D.C. N.D. Ohio, Case No. C71-1181, filed November 30, 1971, the parties reached a consent decree in 1975 in order to address constitutional violations in the old County jail. The Court ordered that the jail was engaging in "Fifth and Fourteenth constitutional amendment infringements resulting from prevailing conditions at the Cuyahoga County Jail arising from the inordinately excessive number of inmates incarcerated at the facility," ordering that the overcrowding "cannot be permitted to continue into the future."  *Sykes v. Krieger*, 451 F. Supp. 421, 424-425 (N.D. Ohio 1975). The Court further ordered that the jail population "shall not exceed 375 individuals" and ordered the defendants to present a "joint comprehensive plan designed to reduce the population" within a set timeframe. *Id.*

39.     Shortly thereafter, the facility now called "Jail I" (located at West 3rd Street and Lakeside Avenue in Cleveland, Ohio) was opened. But just nine years after *Sykes*, this new facility was the subject of another conditions-of-confinement lawsuit. Filed in 1984, *Watts v. McFaul, et al.,* U.S.D.C. N.D. Ohio, Case No. C84-362, pursued claims related to overcrowding, violations of inmates' right to free worship, and failure to maintain adequate staffing, resulting in the denial of inmate services. This case also resulted in a consent decree, involving federal judicial oversight lasting from 1987 through 1994, which limited the population in Jail I to its maximum capacity of 770 inmates and addressed a panoply of constitutional violations similar to those at issue in this case. *See Watts v. McFaul*, 158 F.R.D. 598 (N.D. Ohio 1994).

40.     However, during the pendency of this consent decree, Cuyahoga County failed to comply with its requirements. In 1989, a motion to show cause was filed against the Sheriff and County commissioners seeking an order of contempt. In October 1991, the Court ordered that all

misdemeanants sentenced to Jail I should be released ten days from the date of the order and felons sentenced to serve a prison term there should have their cases reviewed by the trial judge for an alternative resolution. The sheriff was also ordered not to accept any prisoner sentenced there until further court order. Ultimately, in order to avoid either a shutdown of the jail, or other sanctions against public officials, Cuyahoga County was able to submit a bond issue to the voters to fund Jail II, which was built in 1994, prior to the termination of the consent decree. *Id.*

41.     Despite building two new jails in 1976 and 1995, CCCC today operates in complete crisis, under worse overcrowding conditions than these prior federal cases: though the capacity of Jail I and Jail II is only 1,765, as of November 1, 2018, the current Inmate/Detainee population is over 2,400. At least seven people died in CCCC in a four-month span. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

42.     In 2014, County Executive Defendant Armond Budish hired Kenneth Mills as Director of Regional Corrections. Mills was responsible for overseeing operations of the entire CCCC complex. Despite being the highest-ranking administrator of the jail, Mills had absolutely no experience in the field of corrections administration. The in-custody deaths in 2018 all occurred under Mills' watch.

43.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

**The Ohio Department of Rehabilitation and Correction Finds in 2017 that
CCCC Is Operating in Violation of Ohio Law**

44.     The Ohio Department of Rehabilitation and Corrections' (ODRC) Bureau of Adult Detention November 2017 inspection found CCCC was not in compliance with Ohio's Minimum Standards for Adult Detention Centers. (ODRC Bureau of Adult Detention Report attached as Exhibit 1.) The inspection revealed that CCCC was in violation of Ohio Admin Code Sections:

   a.   5120:1-8-04 (A)(4): CCCC was not in compliance with minimum requirements for sufficient space, including day space of "thirty-five square feet per number of occupants occupying the day space at one time" at a "[m]inimum size of one hundred five square feet," as CCCC "exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of day space for each inmate";

   b.   5120:1-8-04 (B): CCCC was not in compliance with the requirement that seating shall be provided in holding areas, holding cells, housing cells, dormitories, dayrooms and eating areas for each inmate, having "exceeded the Bureau Recommended Capacity for their facility" without "the required amount of seating for each inmate";

   c.   5120:1-8-04 (F): CCCC was not in compliance with minimum toilet facilities of one operable toilet for every twelve occupants, as CCCC "has exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of toilets for this standard";

   d.   5120:1-8-04 (G): CCCC was not in compliance with minimum shower facilities "of one operable shower for every twelve occupants, as CCCC

11

exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of showers for this standard";

e.  5120:1-8-04 (J): CCCC did not provide "[n]atural light" "in housing units, dorms, cells and/or dayspaces" as "[t]he age and layout of the existing jail facility does not provide natural light for Housing Unit 4 North";

f.  5120:1-8-11 (A): CCCC did not provide "[e]xercise and/or equipment for inmates" or "ensure that inmates are offered at least five hours per week" as CCCC's "current policy, procedures and practices need reinforced to reflect standard and components specified" and CCCC's "supporting documentation did not evidence compliance for this standard regarding recreation access for the Inmate Population in Jail 1."

**The Pretrial Justice Institute Finds in 2017 that CCCC Is Overcrowded**

45.  On September 2017, Pretrial Justice Institute (PJI) issued a report entitled "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback." This report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017, available at https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile. ashx?DocumentFileKey=c4587ef2-8416-18fe-e19d-b188d3691e93&forceDialog=0.)

46.  The PJI report noted that CCCC is so overcrowded that most of Detainees/Inmates are housed two people per cell even though cells are designed for only one person.

**The Cuyahoga County Bail Task Force Finds in March 2018 that
Inmates/Detainees Remain in CCCC Custody for Unnecessarily Long Periods of Time**

47.    The PJI report was also cited in the March 16, 2018 Report and Recommendations of the Cuyahoga County Bail Task Force. The Task Force set forth several specific recommendations to centralize pretrial services and reform the bail system in Cuyahoga County, including, for example, providing bail hearings six or seven days a week and accepting bail payments twenty-four hours per day, seven days per week, to ensure that individuals do not sit inside CCCC for unnecessarily long periods of time before bond is set and paid.

**Cuyahoga County Has Been on Notice of Overcrowding and Medical and
Mental Health Issues Since at Least 2017 But Has Taken No Action
and Instead Increased Overcrowding**

48.    In May of 2018, former Director of Regional Corrections Kenneth Mills admitted to the Cuyahoga County Council that the main jail had been understaffed for "a while," but was unsure exactly how long.

49.    On December 13, 2018 at a CMBA Hot Talks event, Defendant Cuyahoga County Chief Public Safety & Justices Services Officer Brandy Carney admitted that the ODRC's yearly inspection put Defendant Cuyahoga County on notice of overcrowding and issues with medical and mental health care at CCCC.

50.    Nonetheless, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with Ohio's Minimum Standards as defined in Ohio Admin. Code § 5120:1.

51.    Further, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with constitutional standards.

52.    Defendant Cuyahoga County has also regionalized CCCC's operations, and in this process, took over operations for the Cleveland City Jail and other municipal jail facilities. In

taking over these facilities, Cuyahoga County increased the number of Detainees/Inmates in County custody despite already-rampant overcrowding in the CCCC.

53.     Upon information and belief, Cuyahoga County officials stated in public meetings that they expected the jail regionalization to bring between $1.7 million and $5.5 million in net revenue annually to Defendant Cuyahoga County. Former Director of Regional Corrections Kenneth Mills stated on April 3, 2018 to Cuyahoga County Council, "[A]s long as we keep the beds filled up, I think it's a very safe projection."

**United States Marshals Service Report Condemns the Conditions at CCCC**

54.     On November 21, 2018, the United States Marshals Service (USMS) released a Quality Assurance Facility Review report. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers. (USMS Report attached as Exhibit 2).

55.     The USMS Report findings include, but are not limited to:

a.   Failure to institute a quality control plan to provide an annual review of CCCC operations to ensure compliance with CCCC policies and procedures;

b.   Failure of Warden and Assistant Warden to make required weekly visits to housing units and visits are not documented;

c.   Failure to maintain proper inmate/detainee records;

d.   Failure to track the frequency and cumulative length of Restrictive Housing Unit (RHU) placement;

e.   Failure to provide updated inmate handbooks, any inmate handbooks in any language other than English, and to properly consider language needs of non-English speakers;

f.   Failure to properly track, store, and ensure safety and security of Detainees'/Inmates' personal property;

g.   Failure to provide Detainees/Inmates with disabilities with necessary accommodations, including access to all services and programs such as outside recreation;

h.   Failure to compensate Detainees/Inmates monetarily for work;

i.   Failure to provide necessary staffing;

j.   Failure to comply with restrictive housing policies required for Special Response Team (SRT) staff members assigned to RHU;

k.   Failure to provide training to RHU staff on correctional implications for brain development of young adults (ages 18-24) and associated de-escalation tactics;

l.   Failure to train annually on safety/security/fire/medical procedures, sexual abuse and assault, and supervision of offenders;

m.   Failure to properly staff the medical unit;

n.   Failure to ensure proper certifications by all medical unit staff;

o.   Provision of only minimally-acceptable sanitation in the 7th-floor mental health dispensary;

p.   Failure of the medical quality management program or Continuous Quality Improvement (CQI) Program to meet within the past year;

q.   Failure to document any corrective actions to remedy problems with medication delivery and duplication of orders by medical providers;

r.   Failure to properly maintain and manage medical records;

s.   Failure to conduct medical screening of City of Cleveland detainees upon intake;

15

t.   Failure to make medical unit aware of Detainees'/Inmates' health needs upon intake unless they present urgent or emergency situations;

u.   Failure to conduct comprehensive medical and mental health appraisals within 14 calendar days of Detainee/Inmate arrival;

v.   Failure to conduct oral screenings by dentist or qualified dental staff within 14 calendar days of Detainee/Inmate arrival;

w.   Failure to address the backlog of Detainee/Inmate requests for medical and dental care, known as "kites";

x.   Failure to properly track chronic care patients;

y.   Failure to implement a proactive program to discuss and implement individually-tailored plans for special needs patients which include, but are not limited to, developmentally disabled individuals, frail/elderly individuals, individuals with physical impairments, serious mental health needs, and juveniles;

z.   Failure to provide for juvenile Detainees/Inmates needs with regard to diet, exercise, and nutrition, including the failure of medical staff to request increased caloric diets for juveniles;

aa.  Failure to house juveniles separately from adult Detainees/Inmates;

bb.  Failure to comply with federal, state, and local regulations regarding the safe disposal and storage of biohazard and infectious waste;

cc.  Failure to consistently process medication for Detainees/Inmates who are scheduled for court or changes in housing;

dd.  Failure to provide thorough and consistent training for medical administration;

16

ee. Failure to provide intensive clinical mental health treatment to Detainees/Inmates with stable conditions who are housed in RHU during the entirely of their stays in RHU;

ff. Failure to conduct a face-to-face assessment for Detainees/Inmates with stable mental health conditions in RHU at least once per week;

gg. Failure to conduct weekly security inspections of all areas of the facility;

hh. Failure to conduct daily security inspections upon staff assuming a post;

ii. Failure to maintain records of calls to Main Control and County maintenance personnel regarding areas in need of repair;

jj. Failure to utilize generally-accepted best practices for Use-of-Force teams to ensure staff and Detainee/Inmate safety;

kk. Failure to tag and label as evidence all video tapes involving use-of-force incidents;

ll. Failure to require all persons involved in use-of-force incidents to complete written reports.

56. The USMS report's analysis of CCCC medical personnel revealed the following shocking deficiencies:

a. One medical staff member had expired CPR certifications;

b. Four medical staff have expired licenses;

c. One Licensed Practical Nurse has no license on file;

d. One Medical Technical Assistant did not have a diploma;

e. Two EduCare nurses had only partial CPR certifications;

f. One Licensed Practical Nurse and one Nurse Practitioner have board actions on their verifications but no documents of the disposition of those actions;

17

      g.  CCCC does not utilize a National Practitioner Data Bank to search for health

care professional disciplinary or sanctions history.

57.    The USMS report also found that the 6th-floor Medical Unit at CCCC is unsanitary

and overcrowded.

58.    The USMS report also stated that there is no on-site OB/GYN physician on-site at

CCCC since June 2018 when the county's prior OB/GYN physician resigned.

59.    The USMS report found that CCCC is severely overcrowded: the capacity of Jail I

and Jail II is only 1,765, but the current Inmate/Detainee population is over 2,400.

60.    The USMS report also found that CCCC is so overcrowded that Detainees/Inmates

are regularly forced to sleep on mats on the floor.  USMS also documented two pregnant women,

including one five-months pregnant woman, sleeping on the floor.

61.    The USMS report also found that Detainees/Inmates awaiting court hearings are

placed in cells without functioning toilets or running water, and without anywhere to sit, for

periods of time greater than ten hours. The USMS review team found that up to 12 inmates were

locked in a cell designed for two people while awaiting court hearings. They are left unsupervised.

62.    The USMS report also identified 96 corrections officer vacancies, indicating severe

understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs,

the CCCCs daily operation is greatly impacted regarding provision for detainees'/inmates' basic

needs."

63.    Interviews conducted by the United States Marshals Service revealed concerns

among CCCC staff for their own safety and security due to staffing shortages.

64.    Rather than taking efforts to appropriately staff the facility, Defendants instead

implemented what are referred to as "Red Zone" conditions during which Detainees/Inmates are

confined to their cells for 27+ hours at a time are not permitted to access dayrooms, showers, telephones, or outside recreation areas.

65.     Although CCCC often implements Red Zone restrictions, there is no policy or written directive outlining proper procedures for implementation of Red Zone.

66.     The USMS report noted six deaths at CCCC between June and October 2016. The report further found that CCCC failed to conduct any debriefing or mortality review of these deaths and failed to comply with their own policy requiring documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, and autopsy reports to be available in the medical department. There was also no information regarding these inmate deaths available or maintained in the Warden's office.

67.     Upon information and belief, at least seven inmates died within the custody and care of CCCC between June 10, 2018 to October 2, 2018. Three of these people committed suicide. Over the course of the past year, 55 people have attempted suicide while in the care and custody of CCCC.

68.     After each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

69.     Over 100 Detainee/Inmate interviews conducted by the USMS review team revealed "strong and consistent allegations of brutality, use of force punishment, and cruel treatment of the Security Response Team (SRT)," who dress in para-military uniforms.

70.     The USMS review team also observed SRT officers verbally abusing and aggressively interacting with Detainees/Inmates, and observed aggressive conduct and abusive, explicit language directed at Detainees/Inmates by SRT members.

71.     A strong threat of retaliation faces Plaintiffs and anyone else in the custody of Cuyahoga County who comes forward with information about the conditions at CCCC.

72.     SRT officers escorting Detainees/Inmates to interviews with the USMS review team called those Detainees/Inmates "snitches." The behavior was so threatening and dangerous that the USMS review team requested up to ten Detainees/Inmates be removed from CCCC custody for fear of retaliation and Detainee/Inmate safety.

73.     USMS report findings also address general sanitation in CCCC, noting that sanitation levels throughout the housing pods is poor, and that multiple pods contained no cleaning chemicals for Detainees/Inmates to clean their cells.

74.     USMS report findings also address unsanitary foodservice, including the presence of mice and vermin, molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays.

75.     The USMS report further notes that Detainee/Inmate court meals were not properly refrigerated or stored and were found placed in an unused office area that reeked of dead vermin.

76.     Likewise, the USMS report finds that CCCC engages in intentional and deliberate use of food as a punitive measure, including diets for Detainees/Inmates in RHU lacking basic daily nutritional needs and caloric intake standards.

77.     Further, the USMS report noted that medical and religious diets for Inmates/Detainees whose dietary requirements cannot be met from the main menu are not provided.

78.     Likewise, the USMS report states that there is no Imam available for Muslim Detainees/Inmates.

79.     The USMS further found that Detainees/Inmates assigned to "No Contact Housing" are confined for up to 27 hours at a time, are denied daily access to showers and recreation, and are denied toothbrushes, toothpaste, toilet paper, and razors or barbering.

80.    The USMS report also found that Inmates/Detainees are subject to up to 30-day disciplinary isolation without disciplinary hearings in violation of their Fifth and Fourteenth Amendment Due Process rights.

81.    The report also stated that in cases involving a potential disciplinary isolation lasting longer than 30 days, those Detainees/Inmates receive a hearing but do not have access to an impartial disciplinary hearing process.

**CCCC Operates in Violation of Ohio Minimum Jail Standards**

82.    As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

a.    Failure to provide Detainees/Inmates "with articles to maintain personal hygiene (toothbrush, toothpaste, feminine hygiene items and soap";

b.    Failure to limit use of force to "the amount of force necessary to control a given situation," where "in no event is physical force used as punishment";

c.    Failure to use holding cells with "[s]ixty square feet for one to three occupants with twenty square feet for each additional occupant up to a maximum of one hundred twenty square feet (six occupants)";

d.    Failure to provide seating in holding areas and cells for each inmate;

e.    Failure to house inmates in double occupancy cells of at least "one hundred square feet with nine feet least dimension for double occupancy, single bunks";

f.    Failure to maintain temperature at "acceptable comfort levels" in cells;

g.  Failure to provide "sanitation facilities" including "access to an operable flush toilet and lavatory with hot and cold potable water on a twenty-four hour a day basis without staff assistance";

h.  Failure to provide "shower facilities at a minimum of one operable shower for every twelve occupants";

i.  Failure to maintain all areas as "safe and sanitary, including food service and laundry areas" and "daily cleaning of toilets, urinals, sinks, drinking facilities and showers in areas occupied by inmates and disposal of garbage";

j.  Failure to exchange or launder bed linens once weekly;

k.  Failure to exchange or launder issued clothing once weekly, and exchange or launder personal clothing and undergarments twice weekly;

l.  Failure to provide each inmate an opportunity for a hot shower at least every forty-eight hours;

m.  Failure to provide shaving equipment and supplies daily and to make provisions for inmate haircuts;

n.  Failure to provide inmates with access to legal counsel of record including telephone contact, written communication, and confidential visits;

o.  Failure to arrange for all levels of health care, mental health care, and dental care, and failure to assure quality, accessible, and timely services for inmates;

p.  Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

q.  Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a

22

grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel and treatment or follow-up are provided as necessary;

r.  Failure to maintain accurate health/mental health records in written or electronic format;

s.  Failure to immediately refer inmates evidencing signs of mental illness or developmental disability to qualified mental health personnel;

t.  Failure to provide special nutritional and medical diets;

u.  Failure to serve maintain healthy and sanitary kitchen environment and to immediately address health and cleanliness issues;

v.  Failure to provide exercise, television, table games, reading materials, academic training, and opportunity to practice recognized religions;

w.  Failure to ensure that disciplinary measures do not include corporal punishment or withholding food;

x.  Failure to implement disciplinary hearings and to afford an opportunity to appeal disciplinary actions;

y.  Failure to ensure that administrative segregation is not used as a penalty;

z.  Failure to ensure no retaliation by staff for inmate grievances.

**Former CCCC Official Removed Over Public Statements about Denial of Detainees'/Inmates' Access to Adequate Medical Care**

83.  Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018 Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the

23

hiring of nurses and creating an unsafe and environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury", *Cleveland.com* (Dec. 10, 2018), available at https://www.cleveland.com/metro/2018/12/ex-cuyahoga-county-jail-medical-supervisor-subpoenaed-to-testify-before-grand-jury.html.)

84.    Rather than launching an investigation into the medical care crisis at the CCCC, or whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

85.    County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration", *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-of-cuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.)

**CCCC Detainees/Inmates Are Regularly Denied Medical and Mental Health Care**

86.    After Brack's appearance at the May 2018 County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

87.    Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know

about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018), available at https://www.cleveland.com/expo/news/erry-2018/11/12db721f324418/death-of-cuyahoga-county-jail.html.)

88.     Though Defendant County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018 and only one nurse practitioner administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

89.     Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

90.     In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

91.     This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

92.     Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did not receive the required initial medical assessment upon booking, leaving medical conditions unchecked for days.

93.     In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director,

former nursing supervisor says," *Cleveland.com* (May 31, 2018), available at https://www.cleveland.com/metro/index.ssf/2018/05/inmates_deprived_of_proper_med.html.)

94.     Compounding medical and mental health issues, CCCC regularly denies Detainees/Inmates access to necessary hygiene products, including sanitary pads and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

**CCCC Detainees/Inmates with Disabilities Are Regularly Denied
Necessary Accommodations**

95.     Defendants incarcerate and serve significant numbers of individuals with disabilities as that term is defined in the ADA and the Rehabilitation Act.

96.     Defendants routinely fail to provide Detainees/Inmates with accommodations to ensure equivalent access to programs and services offered at CCCC facilities.

97.     Defendants' failure to accommodate Detainees/Inmates with disabilities not only denies them access to programs and services, but also puts them at risk of injury or victimization by other detainees/inmates and by CCCC staff. Moreover, Defendants' failure to accommodate Detainees/Inmates with disabilities results in the provision of inadequate health care and the violation of detainee/inmates' due process rights.

98.     Defendants fail to maintain proper records and tracking regarding identification of Detainees/Inmates with disabilities and related accommodations. CCCC staff are not adequately trained in how to identify and track individuals with disabilities, nor are they trained regarding the provision of adequate accommodations. As a result, Defendants discriminate against Detainees/Inmates with disabilities by denying them accommodations, access to CCCC programs, services, and activities, and placing them at risk of injury or exploitation, or by withdrawing without justification accommodations that have already been provided.

99.     Defendants do not provide an effective or functional grievance system for Detainees/Inmates with disabilities or a method for Detainees/Inmates with disabilities to mark their grievance as disability-related.

100.    Defendants do not provide Detainees/Inmates with adequate notice of how to request reasonable accommodations for their disabilities. As a result, Detainees/Inmates with disabilities are not informed of any specific process for complaining about disability discrimination or requesting disability accommodations.

101.    Defendants lack adequate policies, procedures, practices, training, and supervision for staff concerning how to respond to Detainees/Inmates with disabilities requesting accommodations through means other than the grievance process.

102.    Defendants lack policies and practices to ensure that Detainees/Inmates with disabilities safe in custody and during emergencies, and to provide assistive devices, including, but not limit to, wheelchairs, walkers, and canes. Defendants further fail to adequately train staff to timely and appropriately provide assistive devices to Detainees/Inmates with disabilities. As a result, Detainees/Inmates with disabilities are at increased risk of injury or death.

103.    CCCC facilities are not fully accessible and lack necessary safety features such as grab bars to allow detainees/inmates with disabilities to shower and toilet safely and independently. Upon information and belief, there are additional barriers throughout CCCC facilities, including narrow doorways and raised lips and steps.

104.    Defendants place Inmates/Detainees with psychiatric disabilities in isolation and restrictive housing in violation of the ADA.

105.    Defendants deny access to assistive devices to Detainees/Inmates who are placed in restrictive housing, including segregation.

106.    Defendants fail to ensure that Detainees/Inmates with disabilities are placed in housing units and beds that are accessible and safe. Defendants also fail to adequately train staff on how to house Detainees/Inmates with disabilities in accessible and safe housing and how to provide Inmates/Detainees with disabilities equal and meaningful access to programs and services, including but not limited to recreation.

### CCCC Inmates/Detainees Are Regularly Denied Access to Attorneys

107.    Members of the criminal defense bar regularly report that they arrive at CCCC to visit clients in Cuyahoga County custody, and after waiting for periods up to hours long, their clients are never brought to speak with them.

108.    Further, Inmate/Detainee visits with counsel are regularly limited to a 30-minute maximum time period.

109.    The failure to transport Inmates/Detainees to visitation areas to speak with counsel impedes their constitutional right to counsel. Further, non-visitation and Restrictive time periods effectively forces defendants to accept plea deals and prevents them from exercising their right to trial, particularly in cases involving complex evidence which cannot be reviewed during 30-minute and/or non-existent attorney visits.

### Defendants' Alleged Attempts to Remedy the Constitutional and State Law Infirmities in the Operation of CCCC Are Inconsistent, Inadequate, and/or Misrepresentations

110.    Cuyahoga County agents have publicly claimed they are taking steps to remedy some problems identified in the USMS report.  However, these "fixes" are inconsistent, inadequate, poorly administered, or have been misrepresented.

111.    Further, Defendants have not remedied any of the constitutional violations within CCCC.

112.    For example, the USMS report states that CCCC refused to install shower curtains for Detainees/Inmates in Red Zone RHU. Likewise, the report describes molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays. Though County officials have publicly claimed they have provided new food trays and shower curtains, putative class members state that the new food trays are already soiled and smell moldy because they were mixed in with the old trays, and many showers still have malfunctioning or moldy shower curtains. Similarly, although County officials have reportedly hired exterminators to treat CCCC facilities, putative class members report they have not seen exterminators and insects are still prevalent throughout the jail, including in cells and in stagnant water and on walls in shower areas.

113.    Cuyahoga County's Board of Control also approved funding on December 17, 2018 for a corrections consulting organization to recommend reforms and a separate expansion of prisoner living space. However, the increased living space will only accommodate 118 of the nearly 700 Inmates/Detainees who are pushing the CCCC population above its rated limit. Until the County decreases the jail population or adds enough beds to house every Detainee/Inmate without exceeding facility capacity, overcrowding remains a dire issue.  Likewise, the corrections consulting organization has an entire year to come up with mere recommendations. (*See* Peter Krouse, "Cuyahoga County Board of Control approves funding for jail study, prisoner space," *Cleveland.com* (Dec. 17, 2018), available at https://www.cleveland.com/news/2018/12/cuyahoga-county-board-of-control-approves-funding-for-jail-study-prisoner-space.html.) But an entire year is far too long to wait to address the desperate and dire crisis in the CCCC. Further, recommendations do not constitute actual reform.

114.    Further, many people remain in CCCC custody due to their inability to post even relatively low bonds. The Cuyahoga County Court of Common Pleas and other local courts

continue to set bonds people are unable to pay, condemning those without financial means to suffer months, and sometimes years, of rights violations in overcrowded CCCC facilities.

115.    Compounding these violations, CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process. Detainees'/Inmates' complaints, kites, and grievances are not delivered and/or go unanswered. Their complaints remain unaddressed, and their suffering continues unabated.

**Class Representative Plaintiffs' Accounts Illustrate and Clarify USMS Report Findings**

116.    As set forth below, Class Representative Plaintiffs have suffered unconstitutional conditions at CCCC.

TONYA CLAY

117.    Plaintiff Tonya Clay is a 48-year-old woman currently held as a pretrial detainee in CCCC. Ms. Clay has been housed in CCCC since September 13, 2018.

118.    When she first arrived at CCCC, Ms. Clay was assigned to sleep on a mat on the floor of the common area in her pod for approximately one month due to overcrowding. For the next four months, Ms. Clay was one of two inmates housed in a cell designed to hold one person. All of the one-person cells on her pod housed two women – one sleeping on the metal bunk and one sleeping on a mat on the floor.

119.    Ms. Clay has regularly seen bugs swarming around the showers. Mold covers the walls of the showers and the cracks between the tiles. The drain in the shower Ms. Clay utilized in her previous pod was constantly clogged, resulting in dirty water pooling on the floor and covering Detainee'/Inmates' feet.

120.    As of December 12, 2018, there were no new shower curtains in Ms. Clay's pod and she does not believe any exterminators have been in her pod.

30

121.     Ms. Clay has been on Red Zone for much of her time at CCCC. Her entire pod was once locked down in cells for two straight days, let out only to pick up/return a food tray, and pick up/drop of laundry.

122.     There was a sink/toilet fixture inside Ms. Clay's previous cell, however it often malfunctioned. For one entire week, the only water available from the sink in Ms. Clay's cell was hot. She therefore had no access to cool drinking water during that week for all durations when she was locked in her cell on Red Zone. Finally, a plumber came in to fix the problem, but a new problem arose. After the plumber's work, black water began flowing from the sink. The black water continued to appear intermittently.

123.     Ms. Clay has resorted only to eating food from the commissary when possible, which is expensive, due to the unsatisfactory food served by CCCC. Ms. Clay has been served milk that was past its expiration date and meat that looked and tasted spoiled. Ms. Clay has also been served chicken patties that were freezer burned and very hard. In general, the food portions are small and are not sufficiently filling.

124.     Ms. Clay is also constantly cold in her cell, making it very difficult to sleep. CCCC refused to give her an extra blanket without a medical order.

125.     Detainees/Inmates are only allotted two sanitary pads at once and must ask for more when required for hygienic purposes. However, corrections officers have told her that the help button in her pod should not be pressed unless someone is "dying." She and other Detainee/Inmates are therefore unable to use the help button to call for more sanitary pads when locked in their cells on Red Zone. Corrections officers have told Ms. Clay that their pod is out of both toilet paper and sanitary pads, and made no apparent effort to locate additional necessary supplies.

126.     Ms. Clay also has only two pair of underwear that she was provided by CCCC, which have become threadbare due to the fact that she washes them herself using her own soap in

31

her cell after each use. Ms. Clay is unable to purchase additional underwear through the commissary because it is not offered: only boxer shorts are sold on commissary for men.

127.    Ms. Clay suffers from neuropathy, glaucoma, asthma, and liver damage, among other ailments. These conditions cause her severe pain as well as loss of vision in one eye. CCCC denied her all access to medical care for three months.  When Ms. Clay finally saw a nurse at CCCC, the nurse told her to take Motrin, a medication she is unable to take due to liver issues. After sending several kites requesting care, CCCC allowed Ms. Clay to have blood work done, the results of which she has yet to receive.

128.    Ms. Clay was carrying an inhaler to treat her asthma, but a corrections officer confiscated it. Ms. Clay requested a new inhaler and received a medical kite stating that it has been ordered for her. As of March 5, 2019, she had not received a new inhaler.

129.    On February 18, 2019, Ms. Clay suffered from an asthma attack. She did not receive any medical treatment for four hours.

130.    Ms. Clay has also been diagnosed with both Bipolar Disorder and PTSD.   For her first four months at CCCC, she never received a response to any kites sent to the CCCC Social Worker concerning these conditions.  CCCC discontinued medications Ms. Clay was taking when she arrived at the facility, and instead prescribed different mental health medications. These new medications are not effective and Ms. Clay has sent numerous kites seeking an evaluation. She still has not seen any medical professional to treat her mental health conditions.

131.    Ms. Clay has witnessed intimidation and aggressive tactics on the part of SRT officers. She has been told to "shut the fuck up" and witnessed SRT officers ripping up the sheets of another inmate's bunk during a "shake-down."

132.    Ms. Clay had an altercation with another inmate and, as a result, was moved to segregated housing, known as "the hole," without a disciplinary hearing. While in the hole, Ms.

Clay was denied access to all books and reading material other than a Bible. She was also denied phone calls and all non-attorney visits. She was locked into her small cell alone for all but approximately 20 minutes per day when she was permitted to exit the cell to shower. Meals were passed through a slot in the cell door. She remained in the hole for three days.

133.     Ms. Clay is a recovering alcoholic, but has been denied access to AA meetings because they are often canceled due to Red Zone.

134.     Ms. Clay is Christian and is regularly denied the right to practice her religion because church services are canceled and/or severely shortened due to staffing issues.

135.     Ms. Clay has no access to the computer room or law library.

ANTHONY BONNER

136.     Anthony Bonner is a 39-year old man who was held in CCCC from July 24, 2018 to January 3, 2019.

137.     The food served to Mr. Bonner was consistently very small portions. He was served bologna with no bread.

138.     Mr. Bonner shared a one-person cell with another man. His toilet was once clogged and inoperable for an entire week. During that time, he and his cell mate had to request permission from corrections officers to use the toilet in the common area during Red Zone lock downs.

139.     Two men locked down in a one-person cell means that one person has nowhere to sit, eat, or sleep but on the floor, the toilet, or his cellmate's bunk (and only if the cellmate permits). Cellmates attempt to give each other privacy when one needs to use the bathroom by hiding under bedsheets or helping to create a makeshift curtain around the toilet with a bedsheet, and by continuously flushing the toilet to prevent sounds and odors from permeating the cell.

140.     Each Detainee/Inmate has only one orange uniform. When this uniform is taken to laundry (which only occurs at sporadic and irregular times), each man must sit in his underwear,

if he has any, until the uniform is returned. This means two adult men are forced to sit in a small cell on lockdown for hours in nothing but their underwear, or wrapped in a sheet or towel if they have no underwear. These conditions caused Mr. Bonner to feel emasculated.

141. Each Detainee/Inmate is issued one thin blanket and two sheets. Detainees/Inmates are not issued a pillow.

142. The two showers shared by over 48 men in Mr. Bonner's pod were filthy, covered in mold and soap scum. No new shower curtain were provided for many months. For a period of time, the showers had no curtains.

143. Most of the time, Mr. Bonner was held on Red Zone lockdown and confined to his cell for 22 hours or more. When Detainees/Inmates are released to take showers and move about the day room, there often is not enough time for all of the men to shower. This causes conflict among Detainees/Inmates who are desperate to clean themselves.

144. Recreation time is irregularly made available to the Detainee/Inmates, and only to ten people at a time.

145. Mr. Bonner wanted to attend Alcoholics Anonymous meetings while at CCCC, however they were often canceled due to Red Zone and understaffing. Even when meetings do happen, only seven people are permitted to attend.

146. Religious services are canceled more often than not due to Red Zone restrictions.

147. Mr. Bonner was denied access to attorney calls when on Red Zone restrictions.

148. Mr. Bonner requested mental health care and did not receive any response.

149. Mr. Bonner was held in isolation for over two weeks. The walls, floor, sink, and toilet were filthy. During this time, he repeatedly requested mental health care and was denied. He was served plain oatmeal for every breakfast and one bologna sandwich, one apple or orange, and one small bag of carrots for every lunch and dinner. He was also served one carton of milk for

lunch and dinner, which was often past its expiration date. He was denied access to commissary and therefore unable to supplement this limited food.  He was also denied all access to phone calls, visits, movement beyond a short time to use to the shower, recreation, and all books except a Bible.

150.    On another occasion, Mr. Bonner's entire pod was locked down as punishment because corrections officers claimed to have smelled marijuana. All Detainees'/Inmates' privileges were revoked. They were only permitted to leave their cells for 20 minutes at a time on a rotating basis to shower. They were served only plain oatmeal for breakfast, and one bologna sandwich, one apple or orange, and one small bag of carrots for lunch and dinner.

JAMES MARTIN

151.    Plaintiff James Martin is a 35-year-old man who was a pretrial detainee in CCCC from June 20, 2018 until December 27, 2018.

152.    Mr. Martin spent approximately the first two months of his incarceration sleeping on the floor of the common area day room of a pod. The pod was so overcrowded that no cells were available to him or to the 18 men sleeping on the floor in the day room. All of these men had to share one toilet for approximately one month until a second toilet became available.

153.    For the rest of Mr. Martin's time in CCCC, there were two showers for the entire pod of approximately 48 men. Due to Red Zone restrictions, the men were only permitted out of their cells for limited amount of time daily, and all need to share the showers and phones. As a result, Mr. Martin regularly went several days without access to a shower because there was not enough time allotted for all men to shower. When he was able to shower, the shower area was riddled with insects and the shower curtain is covered in mold and scum.

154.    Detainees/Inmates are provided with inadequate cleaning chemicals and no towels or rags to apply cleaning chemicals. Just one bucket, one sponge, and one toilet scrub brush are provided daily for all Detainees/Inmates in the entire pod to share.

155.     Further, CCCC does not provide clean laundry on a consistent and regular basis. Each Detainee/Inmate has only one orange uniform. When the orange uniforms are taken to be laundered, each Detainee/Inmate must remain in his underwear until the uniform is returned. If an individual does not have a pair of underwear available to him, he is forced to wrap himself in a towel or sheet to cover himself until the laundry is returned.

156.     Mr. Martin was denied proper medical care and monitoring for his serious medical needs, despite his attempts to contact medical staff via unanswered kites.

157.     Mr. Martin has a diagnosis of Bipolar I for which he received medication but not counseling.  He received no response to his kite for the jail social worker concerning this issue. Mr. Martin often was placed in restrictive housing for conduct resulting from CCCC's failure to properly treat his mental health conditions.

158.     As of December 19, 2018, Mr. Martin had not experienced the changes Defendant Cuyahoga County claims to have implemented – there are no new shower curtains and the food is served on trays that smell dirty and like old food.

159.     Severe Red Zone conditions continued through Mr. Martin's time in CCCC. For example, Mr. Martin was locked down on Red Zone starting from Sunday December 16, 2018 at approximately 9:00 p.m. and continuing until Monday December 17, 2018 at approximately 8:00 p.m. He and his pod-mates were allowed out of their cells to shower, move around, socialize, and use the phone for just two hours, until approximately 10:00 p.m. They were then locked in their cells again until Tuesday. At 2:30 PM on Tuesday December 18, his entire pod remained on Red Zone lockdown.

160.     During Red Zone, Detainee/Inmates are locked in their one-person cells with another person. One person sleeps on a mat on the floor, and one person sleeps on the metal bunk

attached to the wall. They eat in their cells. The toilet and sink are attached to the wall and there is no enclosure around the toilet to create any modicum of privacy.

161.     Mr. Martin was placed on "cell isolation" for five days during which he was locked in his cell with his cellmate, but was only permitted to leave his cell to shower once a day for approximately 15 minutes. He never received a hearing or any due process and the jail investigator never interviewed him.

162.     Mr. Martin sent multiple unanswered kites to CCCC's Head Chaplain regarding religious information and requesting a yarmulke. He is a Hebrew Israelite and was denied access to a Rabbi and religious services. Mr. Martin believed, but was not sure, that he received Kosher meals – but the meals were always cold and he was served the same two meals every day.

GEORGETTE PATTERSON

163.     Plaintiff Georgette Patterson is a 53-year-old woman who served a five- month sentence in CCCC custody for a misdemeanor conviction. She was in CCCC custody from August 10, 2018 to January 7, 2019.

164.     Upon her admittance to CCCC, Ms. Patterson was not medically screened. She was suffering from food poisoning causing vomiting and diarrhea but was refused medical treatment because CCCC staff accused her of detoxing. She remained in soiled clothes and sheets for almost twelve hours. At the time, she was assigned to a mat on the floor in the common area of a pod.

165.     After a few days at CCCC, Ms. Patterson was sent to the MetroHealth emergency room for chest pains and was diagnosed with hyponatremia. She did not receive any necessary follow-up care at CCCC until three to four weeks later after she sent numerous kites seeking medical attention.

166.     Ms. Patterson also suffers from Celiac Disease and was denied a proper diet by CCCC for months, which changed only after supporters outside the jail called to advocate on her

37

behalf.  Months of improper diet caused Ms. Patterson to suffer serious medical symptoms and related discomfort.

167.    Ms. Patterson is one of many women housed in CCCC who has suffered severe pain and discomfort from long-lasting vaginal infections. CCCC and medical officials denied her access to any necessary and proper medical care to treat the infections for the duration of her time in CCCC. She now faces potentially serious health consequences.

168.    Ms. Patterson was denied access to Alcoholics Anonymous and Heroin Anonymous. She witnessed correctional staff turn volunteer AA/HA facilitators away due to insufficient staffing.

169.    Ms. Patterson is also diagnosed with Bipolar Disorder. She was in possession of her prescription medication when she was admitted to CCCC, however the medications were taken from her and were not replaced. Despite sending several kites about mental health care since first arriving at CCCC, she did not receive any therapy or medication to treat her condition until December 18, 2018.

170.    Ms. Patterson shared a one-person cell with another inmate aside from the one week she spent sleeping on the floor of the pod common area. Ms. Patterson was forced to sleep on the floor of the cell, despite the fact that there was a bunk order in her medical chart from previous time spent at CCCC. Each of the 14 cells in her pod were filled to double the capacity and people were continuously sleeping on the floor of the pod common room.

171.    CCCC served Ms. Patterson inconsistent and sometimes inadequate portions of food. At times, she received only dry cereal for breakfast. She was also served expired, moldy, spoiled, and otherwise disgusting food, including but not limited to cookies with wheat weevils inside, coleslaw with maggots, bread with mold, and chicken patties with mold. New food trays were mixed with old and became smelly and soiled.

172.    There was no running water from the sink in Ms. Patterson's cell for three months, which meant that she had to get drinking water from another source. During Red Zone times or at night, a corrections officer would sometimes allow Ms. Patterson to leave her cell for drinking water. However, if no officer was around, or if they refused, she had no access to drinking water. At one time, brown water flowed in both the toilet and the sink in Ms. Patterson's cell for three days in a row.

173.    One of the two showers that Ms. Patterson and approximately 28 other inmates used had a clogged drain, causing filthy water to build up to their ankles. Corrections officers removed the shower curtain from the clogged shower rather than fix it. Everyone on the pod had to share one shower. The shower and the shower curtain were dirty and moldy, and the shower curtain was not replaced.

174.    Toilet paper is rationed to two rolls per cell per week for cells housing two people. The toilet paper supply is often inadequate to last for the week. The corrections officers in Ms. Patterson's pod consistently told her that toilet paper had run out.

175.    All women are given only two sanitary pads at a time. Women are required to return to the corrections officers to ask for more, however, they are often told that there are no more sanitary pads available. In this case, women are forced to use toilet paper, if there is any, or their washcloth, if they have one, in lieu of sanitary pads. Although women attempt to save sanitary pads for the following month whenever possible, SRT officers regularly raid and tear apart cells, and during these raids, SRT officers often throw away any extra sanitary pads. Ms. Patterson has also witnessed SRT officers confiscate and throw away women's prescription medical creams during raids.

176.    Ms. Patterson is a Christian and was denied the free exercise of her religion by CCCC. Church services were canceled or severely shortened many times due to understaffing and Red Zone lockdowns.

177.    At one time, Ms. Patterson was sent to the Restrictive Housing Unit for three days before she was afforded any due process. After three days, she was ordered to be released at 7:30 p.m., however at that time she was told there was nowhere to move her. She remained in Restrictive housing for twelve additional hours. During her first day, she was held for 24 hours inside her cell. On the second and third days she was allowed out for approximately 20 minutes. During the entire three days she was not allowed access to any books but for a Bible, and was permitted no phone calls or visits. She was denied a phone call to her attorney for approximately 24 hours.

ZACHARY SCRUGGS

178.    Plaintiff Zachary Scruggs is a 35-year-old man and was in County custody as a pretrial detainee in CCCC from March 9, 2018 until March 5, 2019.

179.    Mr. Scruggs' pod was at nearly double the capacity for which it was built – with every cell, designed for one person, holding two men, one who must sleep on a mat on the floor. Mr. Scruggs shared his one-person cell with another man.

180.    At CCCC, Mr. Scruggs had limited access to a shower. At times, he was forced to wait multiple days between showers: when Detainees/Inmates were briefly released from Red Zone restrictions, there were too many men attempting to use the shower for all men to access showers before Red Zone started again. There were no new shower curtains; the shower and the curtains were covered in mold and soap scum. There were bugs in the showers and in the cells. Mr. Scruggs is not aware of any exterminator treating the facility recently.

181.    The toilet in Mr. Scruggs' cell was broken for two weeks, which caused water to flood the cell. During this time, he and his cell-mate had to request permission to use the toilet in

the common area during Red Zone. CCCC failed to timely fix the toilet or provide necessary supplies and assistance to clean up the mess. Corrections officers forced them to wait unreasonable amounts of time before permitting them to use the bathroom.

182. As of December 18, 2018, the only toilet in the common area was leaking, causing water to flow into the common area of the pod.

183. Mr. Scruggs witnessed the lack of appropriate staffing in CCCC and was often on Red Zone lockdown as a result. On more than one occasion, his pod was on Red Zone for an entire weekend due to the fact that there was a single officer working to cover four dorms.

184. Mr. Scruggs' access to the free practice of his religion was affected by Red Zone and staffing shortages. Church services were often cut very short to get inmates back into their cells to begin Red Zone lockdown again.

185. The food which Mr. Scruggs was served was on trays which smell of mildew, and was often cold due to corrections officers allowing the food to sit for an hour before it was served to Inmates/Detainees. The food portions were small and not filling; he lost weight while in custody due to insufficient calorie intake.

186. Mr. Scruggs also suffered from suicidal thoughts as a direct result of the conditions in CCCC.

187. CCCC's attorney visitation policies and practices resulted in a denial of Mr. Scruggs's right to a lawyer. CCCC only allowed thirty minutes at a time to visit with his attorney, which did not allow him enough time to review necessary discovery and evidence in order to assist in his defense.

188. Mr. Scruggs experienced intimidation on the part of SRT officers. SRT conducted nearly weekly "shake downs" during which they tore apart cells, flipped people off beds, yelled

and name called for no reason, threw away personal property, and acted in an unreasonably aggressive and threatening manner.

### KINDELL SMITH

189.    Plaintiff Kindell Smith is a 28-year-old man. He was held in CCCC as a pretrial detainee from June 21, 2018 to March 6, 2019, after charges pending against him were dismissed.

190.    Mr. Smith suffers from asthma and requires regular breathing treatments. CCCC did not provide him these breathing treatments as prescribed. Mr. Smith also requires a CPAP machine and although his family provided his CPAP machine to CCCC, officials never allowed Mr. Smith to use it. Mr. Smith filed a medical grievance regarding his lack of CPAP machine and irregular breathing treatments. He received no response.

191.    Mr. Smith violated a phone restriction policy and, as a result, his phone privileges were ordered Restrictive.  He was then placed in segregated housing, where he was held in solitary confinement for 24 hours per day.  During the time Mr. Smith was in segregated housing, food was regularly held back by corrections officers, he received no recreation time, and he was repeatedly threatened with mace.  Corrections officers also choked Mr. Smith.

### JOVAN VARNER

192.    Plaintiff Jovan Varner is a 35-year-old man. He has been held in CCCC as a pretrial detainee since December 20, 2017 and is currently awaiting a bed in a mental health treatment facility.

193.    During his time in CCCC, Mr. Varner has witnessed mice near food in the kitchen. The meals served to him by CCCC are very small portions, are often cold, and are served on food trays which have a mildew smell. He has not observed any new trays.

194.    CCCC has housed Mr. Varner with another inmate in a cell designed to house only one inmate at a time. He slept on the floor for over a year while at CCCC.

195.    At one point, Mr. Varner spent three weeks in a cell with a broken toilet that had urine and feces sitting in it. Although he made several complaints, CCCC failed to fix the toilet in a timely manner. Instead, a corrections officer told Mr. Varner to put a bag in his toilet to collect excrement and other solids with and then to dispose of the bag periodically. As a result, Mr. Varner and his cellmate were forced to endure the odor of both urine and excrement throughout the cell.

196.    The conditions at CCCC have made it impossible for Mr. Varner to keep himself clean, hygienic, and appropriately groomed. A pod on which Mr. Varner was housed had two showers for approximately 48 inmates. Due to the number of men and the limited time during which the men can access the shower, Mr. Varner has been unable to shower daily, and sometimes for periods of several days. These showers are infested with insects, and the showers and shower curtains are not only moldy, but Detainees/Inmates are also given insufficient supplies with which to clean showers and their own cells.

197.    Despite the fact that barbers are supposed to visit CCCC once per month, Mr. Varner has been denied access to regular haircuts; he has been waiting approximately six months for a haircut.

198.    CCCC has washed Mr. Varner's clothing only approximately once every one to two weeks.  His sheets are washed even less frequently.

199.    Mr. Varner suffers from asthma and should carry an inhaler. He had an inhaler on his person when entering into custody at CCCC, however CCCC staff took it away from him. Mr. Varner's multiple kites for medical treatment have gone unanswered. Since his admission to CCCC, Mr. Varner has not been able to access any inhaler and has not received necessary medical treatment.

200.    Mr. Varner also suffers from PTSD from previous traumatic life events.  He has written several kites regarding treatment, but over the course of an entire year at CCCC, had only been seen for counseling once.

201.    Most days, Mr. Varner's pod has been locked down on Red Zone. During Red Zone, Mr. Varner and his cell mate are locked into one-person cell – sometimes for dangerously long periods of time. During Red Zone, corrections officers are not easily accessible to the Detainees/Inmates. The Detainees/Inmates are not permitted access to the phone, showers, television, or recreation. Church services are shortened. Mr. Varner and the other Detainees/Inmates spent most of Thanksgiving 2018 locked down on Red Zone; as a result, he was unable to call his family.

202.    SRT officers have frequently searched Mr. Varner's cell.  He feels highly intimidated by SRT officers and their extremely aggressive tactics toward Detainees/Inmates.

TAMAR EVANS

203.    Plaintiff Tamar Evans is a 32-year-old man currently being held in CCCC while awaiting trial. Mr. Evans has been housed in CCCC since December 27, 2018.

204.    During his time in CCCC, the window in Mr. Evans' cell has been covered in ice, the cell has been cold, and he has been permitted only one blanket. He cannot afford to buy additional, warmer clothing in the commissary.

205.    Mold has been present on the vents in his cell. He is unable to clean the mold because cleaning supplies provided to him are insufficient.

206.    Mr. Evans has been subjected to ongoing Red Zone lockdown.

207.    Mr. Evans was denied necessary personal hygiene items during his first week in CCCC.

208.    While at CCCC, Mr. Evans slipped while getting out of bed and injured his wrist, causing pain and swelling. CCCC staff Mr. Evans was given a napkin and scotch tape to treat the injury. Two weeks after the initial injury, Mr. Evans was provided ibuprofen for pain. He still experiences aching pain in his wrist.

209.    On December 31st, 2018, Mr. Evans' criminal defense attorney attempted to visit him. She waited to see Mr. Evans for two hours and was told by corrections officers that Mr. Evans refused to see her. Corrections officers in turn told Mr. Evans that no one was available to escort him to his visit.

210.    While at CCCC, Mr. Evans has been a witness to two separate suicide attempts.

JERRY THOMAS

211.    Plaintiff Jerry Thomas is a 38-year-old man who has been held as a pretrial detainee in CCCC since October 17, 2018.

212.    Mr. Thomas has been forced to sleep on the floor, while his cellmate sleeps on the bunk in their one-person cell, leaving Mr. Thomas to eat and sleep next to the toilet.

213.    Mr. Thomas wore the same clothes, unwashed, for the first nine days that he spent at CCCC.

214.    Mr. Thomas has been a practicing Muslim for several years. While at CCCC, Mr. Thomas has been denied access to religious services. CCCC staff have told Mr. Thomas that they were unable to find an outside imam. Mr. Thomas is certified to lead Muslim religious services himself, but CCCC staff have denied his requests to lead services. As of March 5, 2019, Mr. Thomas had no clean place to pray in or near his cell.

215.    Mr. Thomas has been diagnosed with Schizoaffective Disorder, Bipolar Disorder, and Depression. He was not given the mental health medications prescribed to him until he had

45

been at CCCC for two weeks. By that time, Mr. Thomas had experienced withdrawal symptoms, including manic episodes.

ROBERT GREEN

216.    Plaintiff Robert Green is a 28-year-old man currently housed at CCCC as a pretrial detainee. He has been detained at CCCC since December 14, 2018.

217.    Mr. Green has been one of two Detainees/Inmates in a cell designed for one person, and has resided in a pod subjected to ongoing Red Zone/lockdown procedures.

218.    Mr. Green has often been served food on trays surrounded by swarming bugs.

219.    Mr. Green is a practicing Christian and while in CCCC has been denied the opportunity to attend church services for weeks at a time. Mr. Green is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

220.    Mr. Green has been diagnosed with Mental Retardation, Bipolar Disorder, and PTSD. Since arriving at CCCC, though Mr. Green has been prescribed mental health medication for 17 years, he has not received any medication or mental health treatment. He has experienced anxiety attacks because he is off of his medication. Mr. Green has been told by Jail officials that he has an appointment scheduled on various occasions, and on each occasion his appointment was cancelled.

AMJAD ABUHAMDE

221.    Amjad Abuhamde is a 42-year old man, who is currently in CCCC custody as a pretrial detainee. He entered CCCC custody on February 25, 2019.

222.    Mr. Abuhamde is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

223.    Mr. Abuhamde experiences panic attacks, anxiety, cluster headaches, and other medical conditions.

46

224. Upon his arrival at CCCC, Mr. Abuhamde's wife brought his medications for anxiety, panic attacks, and cluster headaches to the jail. Those medications have never been dispensed to him.

225. Mr. Abuhamde has suffered panic attacks and anxiety issues since entering CCCC.

226. Mr. Abuhamde has submitted over a dozen kites and his wife has contacted CCCC to express concern several times concerning the failure to dispense his medications. Mr. Abuhamde has also made complaints every day since he arrived, sometimes multiple times a day, to nursing and correctional staff, including supervisors, concerning his need for medications for anxiety, panic attacks, and cluster headaches.

227. Finally, nearly two months after he arrived at the jail, he saw a psychiatric nurse during the week of April 16, 2019. She put him on a single pill, but he does not know what it is. The pill is not working and he is having bad dreams and sleeping just a few hours each night. He has attempted to contact nursing staff several times to address these medication needs.

228. In addition, Mr. Abuhamde is a practicing Muslim.

229. For the first several days of his incarceration at CCCC, Mr. Abuhamde was not served halal meals. He was therefore unable to eat during that period.

230. No Imam has been made available to him while in CCCC custody. Likewise, no Friday prayer is offered in CCCC.

231. Mr. Abuhamde has sent multiple kites requesting access to an Imam and Friday prayer, to no avail.

FRANCES JOHNSON

232. Frances Johnson is a 40-year old woman, who is currently in CCCC custody as a pretrial detainee. She entered CCCC custody on April 10, 2019.

233.     Ms. Johnson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

234.     Ms. Johnson is diagnosed with fibromyalgia, substance abuse, PTSD, bipolar, and anxiety. Ms. Johnson also suffered medical complications prior to entering CCCC, and is required to self-catheterize, per medical order.

235.     Ms. Johnson is supposed to self-catheterize six times per day, using a new bag each time.

236.     In 2018, Ms. Johnson was in CCCC custody for approximately thirty days. Medical staff refused to provide her with the required six catheters per day, instead telling her she could only have three. As a result, she developed a severe infection requiring medical treatment, which she was unable to obtain until she was released from CCCC custody.

237.     Upon being taken into CCCC custody in 2019, Ms. Johnson was given one catheter. CCCC staff failed to provide her with a new catheter for the next 72 hours.

238.     Subsequently, though she had been told she would receive three catheters per day, CCCC staff have provided Ms. Johnson with only two catheters per day. Until April 20, 2019, the catheters provided were the wrong size for her.

239.     Ms. Johnson only receives catheters because she begs the nursing staff who are passing medications in the pods to provide them to her. If she does not ask, they do not stop to provide them to her.

240.     Because of all of these problems receiving catheters, Ms. Johnson has developed an infection and is experiencing excruciating pain, bleeding, swelling, and bloating, among other symptoms, which developed rapidly after she arrived at the jail. Discharge from her infection now requires the use of sanitary pads.

241.    Though Ms. Johnson has complained to correctional and medical staff about her extreme pain and other symptoms, her symptoms remain unresolved.

242.    Further, Ms. Johnson was unable to urinate one day, and complained to correctional officers. Correctional staff called the medical unit seven times throughout the day, but a medical staff person only visited her at 9 PM to address this issue. The medical staff member who arrived did not assist Ms. Johnson in completely emptying her bladder, and Ms. Johnson had to continue to attempt to self-treat after the medical staff left that night.

243.    In addition, Ms. Johnson is prescribed three medications for her PTSD, bipolar, and anxiety, but has been denied these medications since she entered CCCC. Though the booking officers told her they would put in a request for her to see a mental health professional, and though she submitted a kite for these issues within 48 hours of arriving at CCCC, Ms. Johnson still has not been seen by a mental health professional as of April 22, 2019.

244.    Moreover, Ms. Johnson has been deprived of her fibromyalgia medication since entering CCCC.

245.    Ms. Johnson has requested kite/medical grievance forms, but these forms have not been available on her pod, and therefore, she has been unable to make additional requests for care and accommodations via kite.

ALLEN REESE

246.    Allen Reese is a 27-year old man, who is currently in CCCC custody as a pretrial detainee. He entered CCCC custody on April 9, 2019.

247.    Mr. Reese is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

248.    Prior to entering CCCC custody, Mr. Reese was in a car accident and suffered a neck injury. Afterward, his spine was fused together at C1 and C2, with four screws and two rods.

249. Mr. Reese is prescribed multiple medications for this disability and associated pain, but he has been deprived of his medications since he entered CCCC custody.

250. Mr. Reese also has a low bunk order, but was told there were no low bunks available, and was forced to sleep on a mattress on the floor, causing him pain and discomfort, until April 28, 2019. Though he is now in a bunk, he has not observed the addition of any new stacking bunks in his pod.

251. Mr. Reese has also submitted several kites asking for a neck prop or extra pillow, but his requests have been denied as "unable to provide at this time." As a result, he experiences cramping and difficulty sleeping. Mr. Reese has also made several verbal requests to correctional staff for a neck prop or extra pillow, but they have been dismissive and walked away when he tried to talk to them.

252. Mr. Reese's injuries require accommodations during showers. However, the seated shower in his pod does not work, and he is forced to use the bath tub. But the bath tub does not have any bars for aiding in getting in and out of the tub, is located in the middle of the pod, and the walls of the tub steep, making it hard to get in and out. These conditions are dangerous for Mr. Reese, and he has almost slipped in the tub on multiple occasions.

253. In addition, Mr. Reese, who is housed in a medical pod, has been deprived of recreation time since his arrival at CCCC.

254. Further, the drinking water in Mr. Reese's pod has at times been brown, and tastes strange.

FRANKLIN PAYNE

255. Franklin Payne is a 57-year old man, who is currently in CCCC custody as a pretrial detainee. He entered CCCC custody on March 30, 2019.

256.     Mr. Payne is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

257.     Mr. Payne is diagnosed with Reflex Sympathetic Dystrophy (RSD) syndrome, including bone, muscle, and nerve deterioration in his legs.

258.     Mr. Payne's RSD requires regular movement and exercise so that he does not deteriorate. At home, he uses an elliptical, treadmill, and bicycle to keep moving, and has accessed physical therapy for this purpose, as well.

259.     Since entering CCCC, Mr. Payne has been denied support braces and a wheelchair, which he used daily prior to being taken into custody. He does not receive physical therapy.

260.     Mr. Payne is housed in a medical pod, where he and other Detainees/Inmates are consistently denied recreation opportunities and the chance to move around, whether during Red Zone or non-Red Zone periods.

261.     Mr. Payne is also only permitted to have a walker since entering CCCC. His legs are deteriorating and becoming shaky.

262.     Because of his disability, Mr. Payne needs a sitting shower. Only some correctional staff in Mr. Payne's pod have been willing to escort him to a shower with accommodations. Other officers refuse to do so. As a result, he has gone as long as four days without being escorted to the shower he is able to use.

263.     Additionally, Mr. Payne is also diagnosed with PTSD, bipolar, paranoid schizophrenia, and depression.

264.     Since arriving at CCCC, Mr. Payne has not been provided with mental health medications, leading to increasing frequency and severity of symptoms. He has not been seen by a mental health professional since he arrived at CCCC, despite submitting multiple kites requesting mental health care.

51

265.     Further, Mr. Payne has a tracheal injury that prevents him from being able to breath if he lies down on his back. Mr. Payne has requested a prop for sleeping to address his tracheal injury-related needs, and got a doctor's order in CCCC for this, but he has not been given a prop to facilitate sleeping.

266.     In addition, SRT conducted a shakedown in every cell in Mr. Payne's pod in or near early April 2019.  After the shakedown, Mr. Payne went back into his cell, where he discovered that his glasses had been broken by SRT officers. He has repeatedly requested new glasses from correctional staff, including supervisors, as well as a case worker. No replacement glasses have been provided to him.

SIDNEY GREEN

267.     Sidney Green is a 39-year old man, who is currently in CCCC custody while serving a misdemeanor sentence. He has been in and out of CCCC custody over the past several months in relation to this case.

268.     Mr. Green is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

269.     Mr. Green is diagnosed with arthrogryposis.

270.     Mr. Green is currently housed in Jail II, where he is confined to his cell for most hours of the day, in particular during implementation of Red Zone.

271.     As recently as April 19 through April 22, 2019, Mr. Green's pod was on Red Zone. During this period, on Friday, Saturday, and Sunday, Detainees/Inmates in Mr. Green's pod were only released from their cells from 7 PM to 9 PM. Mr. Green and the other Inmates/Detainees on this pod were denied recreation during this period, as well.

272.     Mr. Green requires accommodations for eating due to his arthrogryposis: he needs a table upon which to place his food because he cannot hold it and eat at the same time. While in

his Jail II cell, and in particular when Red Zone is in effect, Mr. Green is denied this accommodation. Instead, he has to try to eat while sitting on his bed mat on the floor.

273.     Mr. Green has made several requests to be moved to the medical pod, where he hopes to receive accommodations for his arthrogryposis, to no avail.

274.     While in custody of CCCC, Mr. Green was placed in a restraint chair for several hours. While restrained, his wrists were contorted in a very painful manner, and without accommodation for his arthrogryposis.

275.     Mr. Green has also slept on a mat on the floor for many days in spite of having a low bunk order.  His hips and bones hurt from laying on floor mat all day. He has not observed the addition of new stackable bunks in his pod, and remains sleeping on his mat on the ground.

276.     Mr. Green has also been deprived of sanitary and personal hygiene items, including soap, deodorant, toothpaste, and toothbrush: he was not given any hygiene items by CCCC for nearly one month, and was forced to rely on the goodwill of other Detainees/Inmates for his hygiene needs.

277.     In addition, Mr. Green has observed rats and cockroaches in the dorms, and has been served food – including meat – that was uncooked and still raw.

BRANDON LAYNE

278.     Brandon Layne is a 29-year old man, who is currently in CCCC custody while serving a misdemeanor sentence from Berea Municipal Court. He entered CCCC custody on September 17, 2018.

279.     Mr. Layne is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

280.     Mr. Layne is diagnosed with Asperger syndrome, obsessive-compulsive disorder, bipolar disorder, attention-deficit disorder, and attention-deficit/hyperactivity disorder.

281. After entering CCCC custody, Mr. Layne was deprived of all of his medication for approximately the first month of incarceration. Though he brought one of his medications to CCCC with him when he first arrived, and asked medical staff to verify this prescription, the medication was not provided to him. As of April 22, 2019, he has only been provided with one of his several medications he took prior to entering the jail.

282. Since entering CCCC, Mr. Layne has submitted two kites concerning his other medications, but he has received no response and has not seen a doctor.

283. In addition, Mr. Layne has submitted several kites for specific medical treatment needs, including, for example, bleeding from his ear and nose. Several kites received no response. Others received a delayed response, telling him only that he was on the list for review of his concerns. Ultimately, he did not receive care for these issues.

284. Correctional officers have also discriminated against Mr. Layne and mocked him due to his disabilities. Correctional officers have called him "retard" and "fucking idiot," and have used threatening language toward him. He has also witnessed correctional staff call other Detainees/Inmates "retards" and "idiots" in relation to their disabilities.

285. Mr. Layne is housed in a medical pod and has been regularly deprived of recreation.

ROY BRIDGET

286. Roy Bridget is a 36-year old man, who is currently in CCCC custody. He entered CCCC custody on November 30, 2018, was recently sentenced on a parole violation.

287. Mr. Bridget is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

288. Mr. Bridget is disabled due to nerve damage related to a mild stroke he suffered prior to being taken into custody. This nerve damage affects his ability to fully use his right leg and arm. Prior to entering CCCC, he was in a wheelchair and receiving physical therapy.

54

289.    When Mr. Bridget arrived at CCCC, his wheelchair was taken from him by jail staff. He was given a walker to use instead, but he was unable to ambulate with the walker. As a result, he is usually confined to his cell and is unable to recreate. A nurse took away his walker and he is now left without any assistive device. He has fallen a couple times while trying to move about. His inability to ambulate has also means he has been unable to shower.

290.    Mr. Bridget has also suffered regular nosebleeds since entering CCCC, once so severely that he passed out.

291.    Mr. Bridget additionally suffers from sleep apnea and has been denied access to a CPAP machine while in CCCC custody. His cellmates say he stops breathing for long periods of time during the night.

JAMES GOWNEY

292.    James Gowney is a 59-year old man, who is currently in CCCC custody as a pretrial detainee. He entered CCCC custody on March 18, 2019.

293.    Mr. Gowney is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

294.    Mr. Gowney is diagnosed with nerve damage on the right side of his body, has metal in both of his legs, and an injured back. He is also diagnosed with COPD.

295.    Prior to entering CCCC custody, Mr. Gowney used a wheelchair and lived in a handicapped and wheelchair-accessible home. On occasion, he used a walker or a quad cane. He also slept in a recliner chair because he struggles to breath when laying down flat, and had a home health aid to facilitate his day-to-day needs.

296.    After arriving at CCCC, Mr. Gowney was deprived of all of these accommodations, and instead was given only a single-peg cane for the first 30 days of his detention. This single-peg cane was an inadequate accommodation: Mr. Gowney has fallen while using it.

297.    Finally, on April 19, 2019, after multiple kites and requests, Mr. Gowney was given a walker.

298.    Mr. Gowney's ability ambulate is affected by CCCC's failure to provide him with accommodations. Likewise, his ability to shower is impacted, as there are no rails in the bathroom or shower in his pod.

299.    Mr. Gowney has also been deprived of all pain medication since arriving at CCCC.

TREVIS JOHNSON

300.    Trevis Johnson is a 37-year old man, who has been in CCCC custody as a pretrial detainee. He entered CCCC custody on January 28, 2019.

301.    Mr. Johnson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

302.    Mr. Johnson is diagnosed with diabetes, major depression, anxiety, insomnia, gastroperisis, and diabetic neuropathy.

303.    Since arriving at CCCC, Mr. Johnson has been deprived of all pain medications, and psychiatric medications and treatment.

304.    Since arriving at CCCC, Mr. Johnson has been deprived of access to the recreation room.

305.    Though he is receiving insulin, Mr. Johnson has also been deprived of his special diabetic and gastroperisis diet, and tracking device for diabetes and blood sugar issues. As a result, Mr. Johnson suffers hyperglycemia causing a racing heartbeat, intense sweating, and body shakes.

TIMOTHY BENNETT

306.    Timothy Bennett is a 28-year old man, who is currently in CCCC custody as a pretrial detainee. He entered CCCC custody on February 7, 2018.

307.    Mr. Bennett is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) and requires accommodations.

308.    Mr. Bennett is diagnosed with diabetes, asthma, and seizure disorder, and has related prescriptions, and requires a diabetic diet and a CPAP machine.

309.    However, Mr. Bennett's CPAP machine was taken away from him by CCCC staff. He now experiences regular chest pain, shortness of breath, and racing heartbeat when attempting to sleep.

310.    In addition, since entering CCCC custody, Mr. Bennett has not been provided with his prescribed diabetic diet.

311.    Mr. Bennett was placed in segregation for sixty days. He was not afforded a hearing until he spent fifteen days in isolation. He has not received a response to his appeal.

312.    While in segregation housing, Mr. Bennett passed out twice from diabetic episodes and was found nonresponsive in his cell. He chipped his tooth during one of these episodes.

## CLASS ACTION ALLEGATIONS

### The CCCC Class

313.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, Varner, Evans, Thomas, R. Green, Abuhamde, F. Johnson, Reese, Payne, S. Green, Layne, Bridget, Gowney, T. Johnson, and Bennett (collectively the "CCCC Class Plaintiffs") bring this action on behalf of themselves and a class of similarly situated persons who are now, or will in the future be, subjected to the policies, practices, and customs of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement.

314.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The CCCC Class is so numerous that joinder of all class members is impracticable.  As of October 30, 2018, 2420

Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein and therefore face a significant risk of serious illness, injury, and death. Additionally, the class membership is fluid as Detainees/Inmates enter and exit the facilities daily.

315.    CCCC Class members are identifiable using records maintained in the ordinary course of business by CCCC.

316.    **FED. R. CIV. P. 23(a)(2) – Commonality**: Common questions of law and fact exist as to all CCCC Class members. Among the common questions are:

    a.  Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, subject class members to an ongoing, substantial and imminent risk of physical and psychological harm, illness, and death;

    b.  Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, violate the class members' Fourth, Fifth, and Fourteenth Amendment rights to due process;

    c.  Whether the conditions of confinement in CCCC violate the Eighth Amendment's prohibition on cruel and unusual punishment;

    d.  Whether the Defendants' refusal to provide adequate medical, including dental, and mental health care to class members constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment;

    e.  Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, result in constitutionally cognizable harm or present a constitutionally unacceptable risk of harm;

f. Whether the Defendants unreasonably instituted or condoned the conditions of confinement in CCCC and refused to provide adequate medical and mental health care;

g. Whether the Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of class members;

h. Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' constitutional rights through the conditions under which they confine class members and the lack of adequate medical or mental health care; and

i. Whether the Defendants fail to hire, train and/or supervise CCCC staff and agents resulting in violations of class members' constitutional rights.

317.    **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the CCCC Class, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

318.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire class.

319.    **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the class and will serve diligently as a class representative. Their interests are aligned with those of the CCCC class and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

320.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the

prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

321.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the CCCC Class are common to and apply generally to all members of the Class.  The injunctive and declaratory relief sought will apply as a whole to all members of the CCCC Class.

322.     A class action would be the most fair and efficient method of adjudicating the class members' claims.

**The Restrictive Housing Subclass**

323.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, Varner, Evans, Thomas, R. Green, Abuhamde, F. Johnson, Reese, Payne, S. Green, Layne, Bridget, Gowney, T. Johnson, and Bennett (collectively the "Restrictive Housing Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, held in any form of Restrictive housing in CCCC, including but not limited to Red Zone.

324.     **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Restrictive Housing Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, over 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein, including but not limited to Red Zone, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

325.     Restrictive Housing Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

326.    **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Restrictive Housing Subclass members and predominate over any individual issues that may exist. Among the common questions are:

    a.    Whether Red Zone restrictive housing violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;

    b.    Whether the use of restrictive housing and isolation as punishment without due process violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;

    c.    Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments through the use of Red Zone, isolation, and other restrictive housing under which they confine subclass members;

    d.    Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments;

    e.    Whether the Defendants unreasonably instituted the conditions of confinement, condoned such conditions, and/or were deliberately indifferent to them.

327.    **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Restrictive Housing Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

328.     Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

329.     **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Restrictive Housing Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

330.     **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates – all of the Detainee/Inmates in custody at CCCC are held under Red Zone isolation conditions and many are held under even further restrictive conditions – and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

331.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Restrictive Housing Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Restrictive Housing Subclass.

332.     A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Medical Care Subclass

333.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Martin, Patterson, Smith, Varner, Evans, F. Johnson, and Bennett (collectively the "Medical Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are

now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to medical care.

334. **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Medical Care Subclass is so numerous that joinder of all subclass members is impracticable. As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to adequate medical care, including dental care, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

335. Medical Care Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

336. **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Medical Care Subclass members and predominate over any individual issues that may exist. Among the common questions are:

    a. Whether Defendants' failure to operate a system of adequate medical care poses a substantial risk of serious harm in violation of subclass members' Eighth and Fourteenth Amendment rights;

    b. Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Eighth and Fourteenth Amendments through the failure to operate a system of adequate medical care;

    c. Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Eighth and Fourteenth Amendments;

    d.   Whether Defendants have been objectively unreasonable and/or deliberately indifferent to the serious health care needs, including medical care needs of subclass members, and to the risk posed by their failure to maintain an adequate health care system;

    e.   Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate medical care.

337.    **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Medical Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

338.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

339.    **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Medical Care Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

340.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

341.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Medical Care Subclass are common to and apply generally to all members of the subclass.

The injunctive and declaratory relief sought will apply as a whole to all members of the Medical Care Subclass.

342.    A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Mental Health Care Subclass

343.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Varner, Thomas, R. Green, F. Johnson, Payne, and T. Johnson (collectively the "Mental Health Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to mental health care.

344.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Mental Health Subclass is so numerous that joinder of all class members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to adequate mental health care, therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

345.    Mental Health Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

346.    **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Mental Health Subclass members and predominate over any individual issues that may exist. Among the common questions are:

a. Whether Defendants' failure to operate a system of adequate mental health care poses a substantial risk of serious harm in violation of subclass members' Eighth and Fourteenth Amendment rights;

b. Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Eighth and Fourteenth Amendments through the failure to operate a system of adequate mental health care;

c. Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Eighth and Fourteenth Amendments;

d. Whether Defendants have been objectively unreasonable and/or deliberately indifferent to the serious health care needs, including mental health care needs of subclass members, and to the risk posed by their failure to maintain an adequate health care system;

e. Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate mental health care.

347. **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Mental Health Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

348. Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

349. **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Mental Health Care Subclass and they

have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

350.   **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

351.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Mental Health Care Subclass are common to and apply generally to all members of the subclass.  The injunctive and declaratory relief sought will apply as a whole to all members of the Mental Health Care Subclass.

352.   A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Religious Freedom Subclass

353.   Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Varner, Thomas, R. Green, and Abuhamde (collectively the "Religious Freedom Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional deprivation of their right to religious freedom.

354.   **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Religious Freedom Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the lack of

access to religious practice and expression. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

355. Religious Freedom Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

356. **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Religious Freedom Subclass members and predominate over any individual issues that may exist. Among the common questions are:

   a. Whether the denial of access to religious texts, services, leaders, clothing/grooming, and/or diets violates subclass members' First Amendment rights;

   b. Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' rights under the First Amendment;

   c. Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of class members' rights under the First Amendment.

357. **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Religious Freedom Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

358. Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

359. **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Religious Freedom Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

360. **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

361. This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Religious Freedom Subclass are common to and apply generally to all members of the Subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Religious Freedom Subclass.

362. A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

**The Disability Subclass**

363. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs F. Johnson, Reese, Payne, S. Green, Layne, Bridget, Gowney, T. Johnson, and T. Bennett (collectively the "Disability Subclass Plaintiffs") bring this action on behalf of themselves and a class of similarly situated persons who are now, or will in the future be, subjected to the policies, practices, and customs of the Cuyahoga County Correction Center, including but not limited to the failure to provide accommodations to Detainees/Inmates with disabilities pursuant to the Americans with Disabilities Act and the Rehabilitation Act.

364. **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Disability Subclass is so numerous that joinder of all class members is impracticable. As of April 22, 2019, over 1,765 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein and therefore face a significant risk of serious illness, injury, and

death. Additionally, the class membership is fluid as Detainees/Inmates enter and exit the facilities daily.

365. Disability Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

366. **Fed. R. Civ. P. 23(a)(2) – Commonality**: Common questions of law and fact exist as to all CCCC Class members. Among the common questions are:

> j. Whether the conditions of confinement in CCCC, and the Defendants' failure to provide accommodation for disabilities subjects class members to an ongoing, substantial and imminent risk of physical and psychological harm, illness, and death;

> k. Whether the Defendants' failure to provide accommodations to Detainees/Inmates with disabilities violates the subclass members' rights under the Americans with Disabilities Act and the Rehabilitation Act;

> l. Whether the Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of class members;

> m. Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' rights through the conditions under which they confine class members and the failure to accommodate disabilities;

> n. Whether the Defendants fail to hire, train and/or supervise CCCC staff and agents resulting in violations of Disability Subclass members' rights.

367. **Fed. R. Civ. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Disability Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

368.     Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire class.

369.     **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the Disability Subclass and will serve diligently as a class representative. Their interests are aligned with those of the Disability Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

370.     **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 1,765 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

371.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Disability Subclass are common to and apply generally to all members of the Subclass.  The injunctive and declaratory relief sought will apply as a whole to all members of the Disability Subclass.

372.     A class action would be the most fair and efficient method of adjudicating the class members' claims.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth, Eighth and Fourteenth Amendments

373.     All of the foregoing paragraphs are incorporated as though fully set forth here.

374.     The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fourth, Eighth, and

Fourteenth Amendments to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

375.    The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiff's basic human rights and dignity, and their right to be free from unconstitutional conditions of confinement, cruel and unusual punishment, and unreasonable searches and seizures under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

376.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

377.    Defendants have been and are aware of the unconstitutional and dangerous conditions of the CCCC and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the classes they represent.

378.    Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the classes they represent tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

379.    Plaintiffs have no adequate remedy at law for these violations.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment

380.    All of the foregoing paragraphs are incorporated as though fully set forth here.

381. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the First Amendment to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

382. The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiffs' rights to freely and openly exercise their religious freedom guaranteed under the First Amendment to the United States Constitution.

383. These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

384. Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

385. Defendants have caused and continue to cause Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

386. Plaintiffs have no adequate remedy at law for these violations.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Sixth Amendment

387. All of the foregoing paragraphs are incorporated as though fully set forth here.

388. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Sixth Amendment of the

United States Constitution, which guarantees the right to effective assistance of counsel and the right to confer with one's lawyer. These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

389.     These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violation of the constitutional rights of Plaintiffs and the classes they represent.

390.     Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

391.     Defendants have caused Plaintiffs and the class they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

392.     Plaintiffs have no adequate remedy at law for these violations.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fifth Amendment**

393.     All of the foregoing paragraphs are incorporated as though fully set forth here.

394.     The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fifth Amendment of the United States Constitution, which protects against the denial of liberty without due process of law. These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

395.    Restrictive housing policies and practices, including but not limited to Red Zone, without due process have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

396.    The CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process.

397.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them  by failing to take steps to prevent the harm and/or provide a remedy.

398.    Defendants have caused Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

399.    Plaintiffs have no adequate remedy at law for these violations.

FIFTH CLAIM FOR RELIEF<br>**42 U.S.C. § 1983, Eighth Amendment, Americans with Disabilities Act, Rehabilitation Act**

400.    All of the foregoing paragraphs are incorporated as though fully set forth here.

401.    The ADA prohibits public entities from denying "a qualified individual with a disability…the benefits of the services, programs, or activities of [the] public entity" because of the individual's disability. 42 U.S.C. § 12132. The term "public entity" is defined in the ADA to include "any State or local government" and "any departmental agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104. Cuyahoga County Correctional Center is a "public entity" for purposes of the ADA.

402.    Defendants are legally responsible for all violations of the ADA by CCCC employees, staff, and contractors who provide programs, services, or activities including, but not limited to medical, mental health, and dental care services, to Detainees/Inmates within CCCC facilities.

403.    By their policies, practices, and customs described herein, Defendants subject the disability subclass to a substantial risk of serious harm from failing to provide necessary accommodations for Detainees/Inmates with disabilities, including both physical and mental health conditions.

404.    The Disability Subclass have physical and/or mental impairments that substantially limit one or more major life activities. Members of the Disability Subclass are qualified – with reasonable modifications – to participate in the programs, services, and activities offered by CCCC. Thus, members of the Disability Subclass are, and Plaintiffs represent, qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104.

405.    The programs, services, and activities that Defendants provide to Detainees/Inmates include, but are not limited to, sleeping, eating, showering, toileting, exercising, entertainment, safety and security, the Jail's grievance, administrative, disciplinary, and classification systems, medical, mental health, and dental services, and other programs. These activities are covered by the ADA.

406.    The Department of Justice issued regulations defining forms of discrimination prohibited by Title II of the ADA, and specifically regulate adult detention and correctional facilities. 28 C.F.R. § 35.152.

407.    The Defendants have violated the rights of the Disability Subclass secured by Title II of the ADA and its implementing regulations.

408.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents, officials, employees, and all persons acting in concert with them under the color of state law, in their official capacities.

409.    These policies, practices, and customs are the proximate cause of the Plaintiffs' and the Disability Subclasses' ongoing deprivation of rights secured by the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.

410.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

PRAYER FOR RELIEF

Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class and subclasses they represent have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the violations of these rights create a present and significant risk of injury, illness, and death.

WHEREFORE, Plaintiffs and the class and subclasses they represent request that the Court grant them the following relief:

a. Declare that this lawsuit be certified under Federal Rule of Procedure 23 as a Class Action on behalf of all present and future inmates of the CCCC;

b. Adjudge and declare that the acts, omissions, and practices of Defendants and their agents, employees, officials, and all persons acting in concert with them, under color of law and otherwise, as described herein, are in violation of the rights of Plaintiffs and the class and subclasses they represent pursuant to the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth

77

Amendments to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act;

c. Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of law, from subjecting Plaintiffs and the class and subclasses they represent to the illegal and unconstitutional conditions, acts, omissions, policies, practices, and customs set forth above, including the following specific relief:

1. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from operating the CCCC in violation of the minimum standards for full service jails in the State of Ohio, including maintaining population at or below the maximum permitted population and from requiring detainee/inmates to sleep on the floor;

2. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining Defendants from operating the CCCC in an unsanitary and unsafe manner, including but not limited to enjoining Defendants from housing detainee/inmates without access to safe and clean drinking water, toilets, hygienic conditions, and providing moldy, spoiled, unsafe food;

3. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from denying detainee/inmates adequate access to necessary medical and mental health care;

4. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent by ordering Defendants to allow ready access to confidential attorney visits and free exercise of religion;

5. Appointment of a monitor to create, institute, and oversee a plan to immediately

take corrective action to address the constitutional violations and the policies, practices, and customs of the Defendants which proximately cause the constitutional violations set forth above;

d.  Order Defendants to make all accommodations, and to make all programs and services accessible and available to Inmates/Detainees with disabilities as required by the Americans with Disabilities Act and the Rehabilitation Act;

e.  Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practicable, a plan to eliminate the substantial risk of serious harm suffered by Plaintiffs and the class and subclasses they represent as a result of Defendants' policies, practices, customs, and failures to train and supervise correctional and medical staff, as set forth herein. The plan should include, at a minimum:

    1.  Population: Policies and procedures for population management so that the number of prisoners is kept at a level that can be safely managed and is not in excess of CCCC facilities' legal capacity;

    2.  Staffing: Policies and procedures to increase the number of trained correctional and medical staff to ensure the safety and security of the Detainee/Inmate population;

    3.  Environmental Conditions: Policies, procedures, and training to improve basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to immediately reducing overcrowding, a deep clean of the facilities, bed bug extermination, and remedying plumbing problems and access to clean drinking water;

4. Classification and Housing: Policies, procedures, and training to classify and house prisoners to ensure their safety and security;

5. Screening: Policies, procedures, and training for thorough screening for medical, dental, and mental health conditions that require treatment, and for communication of medical, dental, and mental health needs to medical, dental, and mental health care providers;

6. Health Care Access: Policies, procedures, and training that provide prisoners with timely access to health care;

7. Health Care Staffing: Policies and procedures to provide prisoners with timely access to sufficient numbers of qualified and competent clinicians who can provide routine, urgent, emergency, and specialty health care, and who do not withhold care for punitive purposes;

8. Emergency Response: Policies, procedures, and training for timely and competent responses to medical and mental health emergencies;

9. Medication and Supplies: Policies, procedures, and training for timely, secure, and accurate prescription and distribution of medications and supplies necessary for medically adequate care;

10. Chronic Care: Policies, procedures, and training for timely access to competent care for chronic conditions;

11. Mental Health Treatment: Policies, procedures, and training for: timely access to necessary treatment by qualified staff for serious mental health needs, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch; access to hospitalization and inpatient care; prohibitions or limitations on the use of seclusion and restraints;

disciplinary policies and practices regarding persons with psychiatric disabilities that appropriately consider their disabilities; and training of corrections and health care staff to recognize and treat prisoners' psychiatric and/or psychological disabilities;

12. Quality Assurance: Policies and procedures for a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

13. Restrictive Housing: Policies and procedures prohibiting confinement of Detainees/Inmates in conditions of social isolation and restrictive movement that put prisoners at substantial risk of serious physical and mental harm;

14. Grievances: Policies, procedures, and training for an effective, accessible, and well-administered grievance process;

15. Accommodations for Detainee/Inmates with Disabilities: Policies, procedures, and training to ensure that detainees/inmates with disabilities are not denied the benefits of, or participation in, programs, services, and activities offered by CCCC; that detainee/inmates with disabilities are timely identified, tracked, and assessed, have their disabilities accommodated, are provided with an effective grievance procedure, are provided with all needed assistive devices and other accommodations, and receive effective communication in all settings, including but not limited to health care, classification, and discipline proceedings.

f.  Order the implementation of meaningful due process rights for inmates who are accused of rule infractions, which includes notification, a hearing by impartial staff, the ability to call witnesses, and the ability to question the accuser;

g.  Order the implementation of reasonable system for determining sanctions for inmates found to have committed rule infractions, to be identified in the inmate handbook, setting forth the specific punishment for various institutional offenses, and eliminating unfettered discretion in punishment and removal of privileges;

h.  Order Defendants to allow access to religious services and to cease and desist from infringing upon religious freedom;

i.  Order Defendants to provide Detainees/Inmates with open, unrestricted, private, contact visits with their attorneys;

j.  Order the appointment of an independent Ombudsman to hear Detainee/Inmate complaints at CCCC;

k.  Order Defendant to create and honor a Detainee/Inmate Bill of Rights;

l.  An award of costs and reasonable attorneys' fees to Plaintiffs' counsel in an amount to be determined by the Court;

m.  All such other relief to which Plaintiffs are entitled and/or this Court deems equitable.

***TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED.***

*/s/ Sarah Gelsomino*
Sarah Gelsomino (0084340)
Jacqueline Greene (0092733)
Terry Gilbert (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, Ohio 44113
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
tgilbert@f-glaw.com

James L. Hardiman (0031043)
CLEVELAND BRANCH NAACP
3615 Superior Avenue
Cleveland, Ohio 44114
T: (216) 431-7811
F: (216) 431-7644
attyjhard@aol.com

J. Philip Calabrese (0072709)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, Ohio 44113
T: (216) 443-9000
F: (216) 443-9011
pcalabrese@porterwright.com

Caroline H. Gentry (0066138)
Ana P. Crawford (0090581)
PORTER WRIGHT MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, OH 45402
T: (937) 449-6748
F: (937) 449-682
cgentry@porterwright.com
acrawford@porterwright.com

*Counsel for Plaintiffs*

Dated: May 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Sarah Gelsomino
SARAH GELSOMINO
*One of the Attorneys for Plaintiffs*